UNITED STATES *v.* UNIVIS LENS CO., INC. ET AL.*

No. 855.   Argued April 9, 10, 1942.—Decided May 11, 1942.

*Together with No. 856, *Univis Lens Co., Inc. et al.* v. *United States,* also on appeal from the District Court of the United States for the Southern District of New York.

*Mr. Samuel S. Isseks* and *Assistant Attorney General Arnold,* with whom *Solicitor General Fahy* and *Messrs. James C. Wilson, Richard H. Demuth,* and *Stanley E. Disney* were on the brief, for the United States.

*Mr. H. A. Toulmin, Jr.,* with whom *Messrs. Frederick S. Duncan* and *John M. Mason* were on the brief, for appellees in No. 855 and appellants in No. 856.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

These cases come here on direct appeal and cross appeal from a judgment of the District Court granting in part and denying in part the Government's prayer for an in-

junction restraining violations of §§ 1 and 3 of the Sherman Act, 15 U. S. C. §§ 1, 3, which make unlawful any contract, combination or conspiracy in restraint of trade or commerce among the states. The principal questions for decision are:

*First:* Whether the system established and maintained by the Univis Corporation, appellee and cross appellant, for licensing the manufacture and sale of patented multifocal eyeglass lenses is excluded by the patent monopoly from the operation of the Sherman Act.

*Second:* Whether if not so excluded the resale price provisions of the licensing system are within the prohibition of the Sherman Act and not exempted from it by the provisions of the Miller-Tydings Act amendment of § 1 of the Sherman Act, 50 Stat. 693.

Appellee, Univis Lens Company, was the owner of a number of patents and two trademarks relating to multifocal lenses. In 1931 it organized appellee, Univis Corporation. The Lens Company then acquired and now holds a majority of the stock of the Corporation. The individual appellees are the principal stockholders of the Lens Company. They are stockholders in the Corporation and are the principal officers of both corporations, which may for the purposes of this suit be treated as though they were a single corporation. Upon the organization of the Corporation, the Lens Company transferred to it all its interest in the patents and trademarks presently involved, and the Corporation then proceeded to set up and has since maintained the licensing system which the Government now assails.

The relevant features of the system are as follows: The Corporation licenses the Lens Company to manufacture lens blanks and to sell them to designated licensees of the Corporation, upon the Lens Company's payment to the Corporation of an agreed royalty of 50 cents a pair.

The lens blanks are rough opaque pieces of glass of suitable size, design and composition for use, when ground and polished, as multifocal lenses in eyeglasses. Each blank is composed of two or more pieces of glass of different refractive power, of such size, shape, and composition and so disposed that when fused together in the blank it is said to conform to the specifications and claims of some one of the Corporation's patents.

The Corporation also issues three classes of licenses—licenses to wholesalers, to finishing retailers and to prescription retailers. The licenses to wholesalers authorize the licensees to purchase the blanks from the Lens Company, to finish them by grinding and polishing, and to sell them to prescription licensees only at prices fixed by the Corporation licensor. In finishing the lenses so as to make them an effective aid to vision of the prospective wearer, to whom the prescription retailer sells, it is necessary for the wholesaler, by grinding the blanks, to conform their curvatures to the prescription supplied by the retailer with his order. By the terms of the license the wholesalers are required to keep full accounts of all sales, showing the sales prices of lenses and the names of the purchasers, and to make them available to representatives of the Corporation.

The licenses to finishing retailers—who purchase the blanks from the Lens Company, grind and polish them and adjust the lenses, in frames or supports, to the eyes of the consumers—contain similar provisions. The retailers are licensed to purchase the blanks of the Lens Company and to sell them to their customers at prices prescribed by the Corporation licensor.

Both the licenses to wholesalers and to finishing retailers require the licensee to notify the Corporation "of any violation on the part of any jobbers or other licensees of the agreements respectively made by them with the Corporation, and to assist the Corporation in all possible ways

in securing evidence against, and enforcing its agreements with such jobbers and licensees."

The licenses to prescription retailers, who are without facilities for grinding and finishing the lenses, but who prescribe and adjust glasses for their customers, are signed both by the Corporation and a licensor wholesaler, and grant to the retailer a "franchise to prescribe and fit Univis lenses," in return for which the prescription retailer agrees to sell finished lenses only to consumers and only at prices prescribed by the Corporation.

All the licenses to wholesalers and retailers recite the Corporation's ownership of the lens patents and purport to confer on the licensee the privilege of selling the patented invention in the manner and to the extent stated. No royalties are exacted of any of the licensees other than the 50 cents collected by the Corporation for each pair of blanks sold by the Lens Company. The rewards of the corporate appellees for the exploitation of the patents and the patented lenses are derived wholly from the sales by the Lens Company of the blanks, from the proceeds of which the 50 cent royalty is paid.

The prices prescribed and maintained under the licensing system are: $3.25 a pair for the blanks sold by the Lens Company to wholesalers, and $4 a pair for those sold to finishing retailers; $7 a pair for finished lenses sold by wholesalers; $16 a pair for white, and $20 for tinted, lenses sold to consumers by prescription and finishing retailers.

The Corporation pursues the policy of issuing licenses to "qualified licensees" who, it is said, are required to maintain "high standards of practice" and to be skilled in the performance of the services which they undertake to render. According to the Corporation's instructions to its field representatives, "price cutters" are not eligible as prescription retailer licensees. Inquiry is made to ascertain whether prospective licensees advertise prices, and whether they are considered in their communities to

be price cutters. The Corporation cancels licenses principally because of the failure of licensees to adhere to the price fixing provisions but also because they advertise prices or the acceptance of installment payments, or for other forms of advertising objectionable to it; for selling Univis lenses to customers other than those designated by the Corporation; for not giving a certain percentage of the licensees' multifocal lens business to Univis; because the licensee is located in a drug, department or jewelry store, or because the licensee engaged in price cutting in the sale of the products of other manufacturers.

For a time the Corporation licensed approximately 20 per cent of the retailers in a locality. It now licenses a larger percentage but not more than 50 per cent. There are approximately 330 wholesaler licensees, 325 finishing retailer licensees and 6,500 prescription retailer licensees located in various states of the Union, including New York and the District of Columbia. The Corporation, by its representatives, solicits licenses and negotiates with licensees in the towns and cities where they conduct their business, including the Southern District of New York. The Lens Company, whose annual sales volume is approximately $1,000,000, ships blanks in interstate commerce from its factory in Ohio to wholesalers and finishing licensees in the various places where they are located, including the Southern District, where its representatives visit licensees for the purpose of instructing them in finishing lens blanks and for promoting sales of Univis lenses. The facts amply established the venue of the court below. *Eastman Kodak Co.* v. *Southern Photo Co.*, 273 U. S. 359, 373.

Of the sixteen patents owned by the Corporation, three are unrelated to the issues of the present case; five are for methods of producing lenses utilized by the Lens Company in manufacturing blanks and do not concern any method or process employed by the licensees who finish

the lens blanks. Each of the remaining eight patents relates to the shape, size, composition and disposition of the pieces of glass of different refractive power in the blanks into which they are fused.

The District Court found, 41 F. Supp. 258, that the claims of each of these eight patents are for a finished lens and that consequently the wholesalers and finishing retailers, in grinding and polishing each lens, practice in part the patent, in conformity to which the Lens Company has manufactured the blanks which it supplies. The court thought that without the granted license the final step in finishing the lens would infringe the patent and concluded that for this reason the Corporation could condition its licenses upon the maintenance by the licensee of the prescribed retail price. See *United States* v. *General Electric Co.*, 272 U. S. 476. But it held that the prescription retailer licenses are unlawful because their restrictions upon the resale of the finished product are not within the patent monopoly and are proscribed by the Sherman Act.

It also held that certain "fair trade agreements" entered into by the Lens Company with the licensees for the control of resale prices of the finished lenses, were not within the exception to the Sherman Act created by the Miller-Tydings Act. This was because the Lens Company had undertaken to fix the resale price of the finished lenses, which are a different product from the lens blanks which it manufactures and sells. The court accordingly limited the relief which it granted to an injunction restraining respondents from carrying out or enforcing the restrictive provisions of the prescription retailer licenses and the fair trade agreements, and from using its licensing system—as has been done in one instance—as the means of preventing a particular competitior from manufacturing and distributing multifocal lens blanks similar in appearance to those produced by the Lens Company.

The Government has not put in issue the validity of the lens patents, but argues that their scope does not extend beyond the structure of the lens blanks and consequently affords no basis for the Corporation's restrictions on the sale of the finished lenses which the wholesalers and finishing retailers fashion from blanks purchased from the Lens Company. It insists that the novel features of the invention do not include more than the combination of shape, size and arrangement of the described pieces of glass when they are fused into the blank; that the grinding and polishing of the blank involve no practice and add no feature not common to the finishing and "fitting" of other types of multifocal lenses which are not covered by the patents; and that their scope cannot be lawfully extended to a procedure not in itself novel merely because it is applied to an article which embodies the only novel features of the alleged invention, and has by the sale become a lawful subject of commerce.

The record gives no account of the prior art and does not provide us with other material to which, if available, resort might appropriately be had in determining the nature of an alleged invention and the validity and scope of the patent claims founded upon it. In any event, we find it unnecessary, in the circumstances of this case, to decide whether, as the court below held, the patent claims can rightly be said to include the finishing of the blanks.

As appellees concede, the invention of only a single lens patent is utilized in making each blank and finishing it as a lens. We therefore put to one side questions which might arise if the finisher of a particular lens blank utilized the invention of some patent other than the patent which was practiced in part by the manufacture of the blank. And we assume for present purposes, without deciding, that the patent is not fully practiced until the finishing licensee has ground and polished the blank so that it will

serve its purpose as a lens. But merely because the licensee takes the final step in the manufacture of the patented product, by doing work on the blank which he has purchased from the patentee's licensee, it does not follow that the patentee can control the price at which the finished lens is sold.

Notwithstanding the assumption which we have made as to the scope of the patent, each blank, as appellees insist, embodies essential features of the patented device and is without utility until it is ground and polished as the finished lens of the patent. We may assume also, as appellees contend, that sale of the blanks by an unlicensed manufacturer to an unlicensed finisher for their completion would constitute contributory infringement by the seller. *Leeds & Catlin Co.* v. *Victor Talking Machine Co.,* 213 U. S. 325, 332–33; cf. *Carbice Corp.* v. *American Patents Corp.,* 283 U. S. 27, 34.

But in any case it is plain that where the sale of the blank is by the patentee or his licensee—here the Lens Company—to a finisher, the only use to which it could be put and the only object of the sale is to enable the latter to grind and polish it for use as a lens by the prospective wearer. An incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it, and upon familiar principles the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold. *Leitch Mfg. Co.* v. *Barber Co.,* 302 U. S. 458, 460–61; *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495. Sale of a lens blank by the patentee or by his licensee is thus in itself both a complete transfer of ownership of the blank, which is within the protection of the patent law, and a license to practice the final stage of the patent procedure. In the present case the entire consideration and compensation for both is the purchase price

paid by the finishing licensee to the Lens Company. We have no question here of what other stipulations, for royalties or otherwise, might have been exacted as a part of the entire transaction, which do not seek to control the disposition of the patented article after the sale. The question is whether the patentee or his licensee, no longer aided by the patent, may lawfully exercise such control.

The declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly, the exercise of which will enable him to secure the financial rewards for his invention. Constitution of the United States, Art. I, § 8, Cl. 8; 35 U. S. C. §§ 31, 40. The full extent of the monopoly is the patentee's "exclusive right to make, use, and vend the invention or discovery." The patentee may surrender his monopoly in whole by the sale of his patent or in part by the sale of an article embodying the invention. His monopoly remains so long as he retains the ownership of the patented article. But sale of it exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article. *Bloomer* v. *McQuewan,* 14 How. 539, 549–50; *Adams* v. *Burke,* 17 Wall. 453; *Hobbie* v. *Jennison,* 149 U. S. 355. Hence the patentee cannot control the resale price of patented articles which he has sold, either by resort to an infringement suit, or, consistently with the Sherman Act (unless the Miller-Tydings Act applies), by stipulating for price maintenance by his vendees. *Bauer & Cie* v. *O'Donnell,* 229 U. S. 1; *Boston Store* v. *American Graphophone Co.,* 246 U. S. 8; *Straus* v. *Victor Talking Machine Co.,* 243 U. S. 490; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 456–57, and cases cited.

We think that all the considerations which support these results lead to the conclusion that where one has sold

an uncompleted article which, because it embodies essential features of his patented invention, is within the protection of his patent, and has destined the article to be finished by the purchaser in conformity to the patent, he has sold his invention so far as it is or may be embodied in that particular article. The reward he has demanded and received is for the article and the invention which it embodies and which his vendee is to practice upon it. He has thus parted with his right to assert the patent monopoly with respect to it and is no longer free to control the price at which it may be sold either in its unfinished or finished form. No one would doubt that if the patentee's licensee had sold the blanks to a wholesaler or finishing retailer, without more, the purchaser would not infringe by grinding and selling them. The added stipulation by the patentee fixing resale prices derives no support from the patent and must stand on the same footing under the Sherman Act as like stipulations with respect to unpatented commodities. *Ethyl Gasoline Corp.* v. *United States, supra.*

Our decisions have uniformly recognized that the purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold. *Adams* v. *Burke, supra,* 456; *Keeler* v. *Standard Folding Bed Co.,* 157 U. S. 659; *Motion Picture Co.* v. *Universal Film Co.,* 243 U. S. 502; and see cases collected in *General Pictures Co.* v. *Electric Co.,* 305 U. S. 124, 128, n. 1. In construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant, *Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488, the particular form or method by which the monopoly is

sought to be extended is immaterial. The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers. Whether the licensee sells the patented article in its completed form or sells it before completion for the purpose of enabling the buyer to finish and sell it, he has equally parted with the article, and made it the vehicle for transferring to the buyer ownership of the invention with respect to that article. To that extent he has parted with his patent monopoly in either case, and has received in the purchase price every benefit of that monopoly which the patent law secures to him. If he were permitted to control the price at which it could be sold by others he would extend his monopoly quite as much in the one case as in the other, and he would extend it beyond the fair meaning of the patent statutes and the construction which has hitherto been given to them.

There is thus no occasion for our reconsideration, as the Government asks, of *United States* v. *General Electric Co.,* *supra,* on which appellees rely. The Court in that case was at pains to point out that a patentee who manufactures the product protected by the patent and fails to retain his ownership in it can not control the price at which it is sold by his distributors (272 U. S. at 489). Accordingly, neither the Lens Company nor the Corporation, by virtue of the patents, could after the sale of the lens blank exercise any further control over the article sold.

The price fixing features of appellees' licensing system, which are not within the protection of the patent law, violate the Sherman Act save only as the fair trade agreements may bring them within the Miller-Tydings Act. Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, *United States* v. *Trenton Pot-*

*teries Co.*, 273 U. S. 392; *United States* v. *Socony-Vacuum Co.*, 310 U. S. 150, and restrictions imposed by the seller upon resale prices of articles moving in interstate commerce were, until the enactment of the Miller-Tydings Act, 50 Stat. 693, consistently held to be violations of the Sherman Act. *Ethyl Gasoline Co.* v. *United States, supra,* 457, and cases cited.

The Miller-Tydings Act provides that nothing in the Sherman Act "shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others . . ." whenever such agreements are lawful where the resale is made.

The contracts entered into by the Lens Company with the licensees of the Corporation stipulate for the maintenance of the prices which are prescribed by the licensing system. Appellees assert, and we assume for present purposes, that the blanks which the Lens Company sells and the finished lenses are marked by appellees' trademark as required by the statute. In the contracts the Lens Company is designated as the manufacturer of "eye glass lenses" which are distributed and sold under the trademark of the manufacturer. But the Lens Company manufactures the blanks and not the finished lenses to which the resale prices apply. It is therefore not the manufacturer of the "commodity" which the licensees sell, and the licensees are not engaged in the "resale" of the same commodity they buy. We find nothing in the language of the Miller-Tydings Act, or in its legislative history, to indicate that its provisions were to be so applied to products manufactured in successive stages by different processors that the first would be free to control the price of

254

his successors. The prescribed prices are thus not within the Miller-Tydings exception to the Sherman Act.

Appellees stress the features of their licensing system by which it is said they protect the public interest and their own good will by the selection as licensees of those who are specially skilled and competent to render the service which they undertake. But if we assume that such restrictions might otherwise be valid, cf. *Fashion Guild v. Trade Commission*, 312 U. S. 457, 467, these features are so interwoven with and identified with the price restrictions which are the core of the licensing system that the case is an appropriate one for the suppression of the entire licensing scheme even though some of its features, independently established, might have been used for lawful purposes. *Ethyl Gasoline Corp.* v. *United States, supra,* 461. The injunction of the District Court will therefore be continued, and extended so as to suppress all the license contracts and the maintenance of the licensing system which appellees have established, other than the Corporation's license to the Lens Company. The judgment in No. 856 is affirmed. The judgment in No. 855 is reversed, and both cases are remanded to the district court for the entry of an appropriate decree in conformity to this opinion.

*No. 855 reversed.*
*No. 856 affirmed.*

Mr. Justice Jackson took no part in the consideration or decision of these cases.