**EXTRACTOL PROCESS, Limited, v. HIRAM WALKER & SONS, Inc.**

No. 8780.

Circuit Court of Appeals, Seventh Circuit.

Jan. 25, 1946.

E. D. McLaughlin and J. Lewis Bond, both of Peoria, Ill. (Hunter, Kavanagh, McLaughlin & Bond, of Peoria, Ill., of counsel), for appellant.

Carl S. Lloyd, of Chicago, Ill., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

Plaintiff brought this suit on U. S. Letters Patent against the defendant, a licensee, for infringement of its patents, Nos. 2,112,805, 2,156,236, and 2,184,248. The alleged infringement was based on a later sale of the machine covered by the patents, by the said defendant in alleged violation of its written license agreement. In the prayer for relief, plaintiff asked:

"Wherefore, plaintiff prays for a decree that the defendant account for and pay over to the plaintiff the profits had by the defendant and the damages which have been suffered by plaintiff by reason of said infringement and that said profits and damages be treble, in view of the wilful and deliberate nature of the infringement, and for such other, further and different relief as to the court may seem just and proper."

Defendant sold the machine, and it was shipped to a place outside the United States. Thereupon plaintiff brought this suit. Defendant moved to dismiss the complaint for its failure to state a cause of action. Its motion was granted, and a decree dismissing the suit was entered. This appeal followed.

Defendant, in support of its motion to dismiss, contended that the case falls within the rule which holds that when a patented article is sold by patentee or a licensee, it is no longer within the protective range of the patent and may be resold by the purchaser without infringement liability. In other words, patentee's control of the sale price is at an end. Boston Store of Chicago v. Am. Graph. Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551.

Appellant, on the other hand, argues that the rule is inapplicable here where the purchaser of the machine is a licensee, and licensed only to *use* the patented machine and is bound by a royalty contract which called for royalty payments dependent upon the amount of the product produced by said machine and which contract prohibited the sale of the patented machine save only as provided by the agreement of the parties. In other words, the license to use, for which a royalty was payable by defendant to plaintiff, could not be terminated by defendant's selling the machine save as the parties provided for such a sale in their contract.

The patent applications covered apparatus and equipment and processes for the extraction of oil from distillers' grains only. Defendant's business was located in Peoria.

The machine was made by Allis-Chalmers Company of Milwaukee, to whom a license was given by plaintiff to *make* the machine and to *sell* it to one to whom the plaintiff had given a license to *use* the machine.

Interesting and unique questions are presented. Their solution necessitates a reexamination of well established principles of patent law, long accepted as settled, but which in recent years have met with criticism, if not rejection, by some counsel and economists because of their alleged conflict with the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note, or because they are against public policy.

Briefly stated, a patent issued by the United States Government, if valid, gives control of the invention covered by the patent for seventeen years from date of issuance to patentee or his assignees. Speaking more accurately, a patent grant carries the right to exclude others. It grants the right to exclude all others in the United States from (a) making, (b) selling, or (c) using the invention covered by the patent for the period of the patent grant. This right to exclude others carries, and was intended to convey, to its grantee, financial advantages. The Government hoped to secure for the public, through such grants and the disclosures necessary for the issuance of a valid patent, other inventions and discoveries of worth and merit, which would benefit mankind. This has been the consistent and continuous course of the United States for 150 years and may be said to be its public policy on the subject of inventions and discoveries.

■ Among the rights incident to complete control of the patented article were and are: (a) the right to sell the grant (or patent) or any part thereof. There exists no limit to the patentee's right to divide this grant, through sales, gifts, or licenses. The patentee may refrain from using it altogether—yet restrain all others from making or using it. Hartford Empire Co. v. United States, 323 U.S. 386, 432, 433, 65 S.Ct. 373, 395.[1]

■ Most commonly described as falling within the complete control of said patented article are: (a) the right to make or manufacture said article. Patentee could make it himself and keep out 'all others. He could grant the right to make the article but limit the number to be thus made. He could restrict the place where they were to be made, and the field for which the maker could make them.

■ (b) He could control the sale of the manufactured article *by the licensee*. As to patentee's control of sales there is limitation. Boston Store of Chicago v. American Graphophone Company, 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551.

■ In other words, if patentee granted a licensee, the right to sell without any reservations, the patentee's right to control the purchaser's right to sell it at a price fixed by it or the licensee is denied. United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. The rule and its exception are stated in United States v. General Electric, 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362.

■ Third, the patent gave the control of the *use* of the article covered by the patent, for the life of the patent, to patentee. In short, patentee had exclusive control over (a) making, (b) selling the article thus made, and (c) using said patented article.

*Most complete was the control if the* patentee neither made nor licensed another to make the article. Almost as complete was the control, where patentee made but did not sell the patented machine. Likewise, was control absolute if he made but did not sell the machine, and yet used it to make or produce other articles of commerce.

Disputes arose from the exercise of the last aforesaid rights in two ways: (a) when the patentee sought to attach a selling price to the article after it had been made and sold by him or a licensee to a third, to a fourth, or to a fifth, etc., party. A challenge of the scope of the patent grant arose from patentee's effort to extend control of sale (by price fixing) beyond the initial sale. On this question of the extent of patentee's control of sale of the patented article, the court was twice called upon to determine the issue. Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880 and Motion Picture Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959. In the second, the later case, the court reached a conclusion contrary to that which it announced in the earlier opinion. Its rather dry and laconic observation, "The decision of Henry v. Dick Co. must be regarded as overruled" has not since been changed by Congress or the Supreme Court. It states the law which followed the judicial pronouncement relating to patentee's price fixing efforts. It definitely set a limit to patentee's price-fixing power. Other than in this respect,

[1] "A patent owner is not in the position of a quasi-trustee for the public or under any obligation to see that the public acquires the free right to use the invention. He has no obligation either to use it or to grant its use to others. If he discloses the invention in his application so that it will come into the public domain at the end of the 17 year period of exclusive right he has fulfilled the only obligation imposed by the statute. * * * This has been settled doctrine since at least 1896. Congress has repeatedly been asked, and has refused, to change the statutory policy by imposing a forfeiture or by a provision for compulsory licensing if the patent is not used within a specified time. The governing rule is quoted in Chapman v. Wintroath, 252 U.S. 126, at page 137, 40 S.Ct. 234, at page 236, 64 L.Ed. 491:

"'A party seeking a right under the patent statutes may avail himself of all their provisions, and the courts may not deny him the benefit of a single one. These are questions not of natural but of purely statutory right. Congress, instead of fixing seventeen, had the power to fix 30 years as the life of a patent. No court can disregard any statutory provisions in respect to these matters on the ground that in its judgment they were unwise or prejudicial to the interests of the public. United States v. American Bell Telephone Co., 167 U.S. 224, 247, 17 S.Ct. 809, 813, 42 L.Ed. 144.'"

the patentee's control of sales is apparently complete.

■■ (b) The second controversy (and here again the patentees were the losers) involved the exercise of attempted control through patent ownerships of products made by the patented machine in alleged violation of a congressional enactment of long standing and far reaching effect, the Sherman Anti-Trust Act. The legal dispute developed in this way. The Sherman Anti-Trust Law did not and was not intended to abolish or restrict the patentee's right of control over (a) making, (b) selling, or (c) using the patented articles for which the Government granted a patent. While this concession was freely made as it was clear and beyond controversy, it was contended that the patentee in exercising his aforesaid rights could not, because he was a patentee, make contracts, called license agreements, which in addition to licensing one to make, sell or use the patented article, contained covenants not arising from the patent grant, but which restricted production, fixed prices or otherwise engaged in practices which prevented or restricted competition in violation of the said Sherman Anti-Trust Act.

The suits which have reached the highest court have not been numerous, but the outcome has been decisive and destructive of patentee's right to enforce such a contract, not even enforce those rights of the patentee which otherwise a court of equity would have granted.[2] In other words, the right to any relief in a court of equity is denied because patentee used or attempted to use his legal rights arising from his patent, illegally. The basis of this denial is the maxim which denies relief to one who seeks equitable relief but who comes into court with unclean hands. In the lower courts this defense of unclean hands as evidenced by monopolistic agreements outside the scope of patent license covenants has become more and more popular and extensively used.

■ Applying the aforesaid to the case before us, we find plaintiff, so he states, gave Allis Chalmers & Co. a license to make one machine which embodied the invention covered by the patent. Apparently Allis Chalmers did not care to make one machine unless it could be sold. Plaintiff therefore granted Allis Chalmers a license to make and sell one of its patented complicated machines. The terms of the license are not specifically set forth in the complaint. It is inferable, however, that plaintiff had found a purchaser to whom Allis Chalmers was to, and did, sell the machine. Whether Allis Chalmers could have sold it without plaintiff's consent or only upon terms prescribed by plaintiff, does not appear. It does appear, however, that defendant, before buying the machine, obtained from plaintiff, a license to *use* the patented machine and agreed to pay plaintiff a royalty for twenty years for the right to continue to use it.[3] Defendant's alleged wrong lay in the fact that it later sold the machine

---

[2] Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; Mercoid Corp. v. Minneapolis-Honeywell Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396.

[3] Among other things the contract provided:

"Whereas the Licensor has heretofore licensed Allis Chalmers Manufacturing Company * * * to manufacture and sell, for use in extracting oil from distiller's grain, apparatus, machinery or equipment disclosed in the aforesaid patent applications * * * subject, however, to the payment, by the user of such apparatus, of a royalty payable to the Licensor for the use of said apparatus * * *

"Whereas * * * Licensee (defendant herein) is desirous of procuring from the Licensor a license to use the apparatus so contracted for * * *

"First: The Licensor hereby grants to the Licensee, the right * * * to use * * * the apparatus contracted * * * for by the Licensee * * *

"Royalty. * * * The Licensee shall pay to the Licensor as a royalty for the * * * use of the aforesaid inventions * * * a sum of money amounting to two percent * * * of the market value fixed as hereinafter specified, of the oil so extracted by use of said apparatus * * * which payments shall be continued for a period of twenty years * * *

"Transfer of License. * * * It is understood and agreed that this license shall be assignable only as a part of the transfer or assignment of the extraction business of the Licensee and shall not otherwise be transferable and shall be operable only at the plant hereinabove contracted for or to be contracted for between the Licensee and said Manufacturer and only for the extraction of oil from the material or materials hereinabove specified."

and shipped it out of the United States. As the amount of royalty depended on the amount of product (oil) produced by defendant through its use, there were unpleasant reactions when plaintiff learned that the royalty producing machine had been shipped abroad. This reaction promptly led to this litigation.

From these facts, it is clear that defendant did not become an infringer or liable as an infringer. It may have breached its royalty agreement, but it did not infringe. Had defendant sold the machine to another user in the United States who used it without being licensed by plaintiff, the situation would have been different. Then, defendant and the purchaser who used it without license from plaintiff, both might have been held as infringers. But defendant shipped the machine beyond the boundaries of the United States, beyond the limits of control of plaintiff's patent.

■■ In reaching this conclusion, we have not ignored plaintiff's clear right to control the making and disposition of the patented article. It was clearly within its right to grant to one party a license to make an article, and to sell the same, and a license to use the article to another party. The patentee is the sole judge of the licensee he shall select, to make, to sell, or to use his patented article. Patentee's reasons for selection of its licensee are of no concern to others. No legitimate attack can be made on the patent or patent grant because the patentee chooses A and B as its licensees and refuses a license to X, Y, or Z. Nor can the grant be assailed because patentee chooses A to make the patented article and chooses B to use it. He may make A an exclusive licensee and he may make B as limited a licensee as he and B may agree to. In other words, patentee may grant both broad and narrow licenses. He may make one licensee exclusive in one field and grant to another licensee, an exclusive or non-exclusive license in another industrial field. This is settled law. It owes its existence to statutes enacted pursuant to authority expressly granted to Congress by the Federal Constitution. These rights should be neither enlarged nor restricted by judicial holdings.

Making full allowance for these rights which plaintiff possessed, it can not recover unless it shows an invasion or infringement of its rights. In this suit it chose to seek redress because of defendant's alleged infringement. The terms of the license

agreement did not obligate defendant to continuously use the patented machine. We think the defendant was not obligated to use it if its operation was at a loss. Likewise the license agreement which plaintiff made with Allis Chalmers does not appear. The record does not permit of a disposition of the appeal as a breach of a license agreement action. We have considered and decided it on the theory which plaintiff advanced in its complaint and on the theory on which it was decided in the lower court and presented to this court. Whether plaintiff has a cause of action for breach of its license agreement with the defendant, we do not consider or decide.

The decree is affirmed.