**ANGEL RESEARCH, INC., Plaintiff,**

v.

**PHOTO-ENGRAVERS RESEARCH, INC., Defendant.**

**Civ. A. No. 60-C-821.**

United States District Court
N. D. Illinois.

March 28, 1962.

Norman Lettvin and George B. Newitt, of Bair, Freeman & Molinare, Chicago, Ill., for plaintiff.

Hobart N. Durham and Lawrence F. Scinto, of Morgan, Finnegan, Durham & Pine, New York City, and Robert L.

Kahn, and Max R. Kraus, Chicago, Ill., for defendant.

PERRY, District Judge.

## FINDINGS OF FACT.

### The Parties and Jurisdiction.

1. Plaintiff, Angel Research, Inc., hereinafter also referred to as "Angel", is a corporation of the State of Illinois, with its principal place of business in Chicago. Prior to filing of the Declaratory Judgment Complaint herein, Plaintiff engaged in the manufacture and sale of chemical compositions useful in the powderless etching of photo-engravings. Plaintiff's chemical composition which is here involved was sold under the name "Di-Etch".

2. Defendant, Photo-Engravers Research, Inc., hereinafter also referred to as "PER", is a corporation of the State of Georgia and has a laboratory and office in Park Forest, Illinois, within the jurisdiction of this Court. Defendant is owner of Jones Patent No. 2,746,848, issued May 22, 1956, entitled "Etching". Prior to Plaintiff's filing of the Complaint herein, the Defendant had charged Plaintiff and/or Plaintiff's customers with infringement of the said Patent No. 2,-746,848. In its Answer, the Defendant admits that it has advised Plaintiff to refrain from preparing and selling etching compositions in conflict with the Jones Patent No. 2,746,848.

3. This Court has jurisdiction of the parties and the subject matter since the action involves a patent, a related claim of unfair competition, and the anti-trust laws of the United States (28 U.S.C. §§ 1337, 1338, 15 U.S.C. §§ 1, 15). Plaintiff seeks declaratory judgment involving a justiciable controversy between the parties, and the Court has jurisdiction (28 U.S.C. §§ 2201, 2202).

### The Issues.

4. The Complaint in effect asserts the following: (1) that the Jones patent is invalid; (2) that Plaintiff has not infringed the patent; (3) that Plaintiff's sales of its goods to "members" of De-

fendant is not an act of infringement; (4) that the Jones patent is unenforceable by reason of Defendant's misuse of the patent; (5) that Defendant has performed certain acts with the purpose and intent to create a monopoly in the line of commerce that includes thiourea additives (Plaintiff's product); and (6) that certain representations and threats made by Defendant have substantially damaged Plaintiff's business.

5. The Defendant's Answer denied the foregoing bases for claims in the Complaint and asserted a Counterclaim against Plaintiff alleging: (7) that the invention described and claimed in the Jones Patent No. 2,746,848 "is of a great value and has come into widespread commercial use"; and (8) that Plaintiff infringed the Jones patent (a) by actively inducing infringement of the Jones patent and (b) by selling and offering for sale the Plaintiff's compositions.

Defendant has conceded at least one of the assertions of Plaintiff, namely that Plaintiff's sale of its goods to "members" of Defendant is not an act of infringement by Plaintiff.

Defendant also conceded that Plaintiff's sale of its additives itself is not a direct infringement of the patent. Defendant relies solely upon a charge of contributory infringement. 35 U.S.C. § 271.

### Disposition of Issues in Defendant's Counterclaim.

6. The record is devoid of any evidence to support Defendant's assertion that the Jones Patent No. 2,746,848 "is of a great value and has come into widespread commercial use". In fact, the evidence of record is to the contrary. Neither Defendant, nor its licensees, ever commercially practiced any of the etching processes, or used any of the etching solutions, specifically disclosed and claimed in the Jones patent. The Defendant's witnesses and documentary exhibits admit that: " * * * practice has shown that the solutions disclosed in the Jones patent require ageing for at least thirty-six hours to have the desired

effect. This requirement of ageing is a serious disadvantage * * *" (DX 1, p. 3); and " * * * thiourea used as taught by Jones, is not considered by Photo-Engravers Research, Inc. to be satisfactory for commercial etching" (DX 1, p. 51).

7. The record is devoid of any evidence that Plaintiff's additives were used commercially in an infringing solution or in an infringing process. The only witness who testified to actual commercial use of Plaintiff's product in a photo-engraving process was Mr. Hutchings of the firm of Hutchings & Melville, Inc. of Chicago. However, Hutchings & Melville, Inc. is a licensee of Defendant and its use is admittedly not an infringement.

The Defendant relies upon the fact that Plaintiff made sales of Plaintiff's additives to the firms of Peerless Hill, Thomas McGrath & Associates, and Newsprint Engraving (none of whom are members of Defendant) together with instructions for use of the additive, to establish contributory infringement.

If all defenses by Plaintiff are ignored for the purpose of testing sufficiency of proofs, the fact remains that there is no direct evidence in the record as to what these three customers did with the material they purchased from Plaintiff. The burden of proving a direct infringement by showing that the purchaser actually practiced the invention claimed is upon the one asserting infringement. The Court may not speculate as to what these customers did with Plaintiff's additives.

It is well settled that if there is no direct infringement of a patent there can be no contributory infringement. There can be no finding of contributory infringement in the absence of proof of a direct infringement. Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 341, 81 S.Ct. 599, 602, 5 L.Ed. 2d 592 (1961). Furthermore, the Courts have consistently resisted applying 35 U.S.C. § 271(b) to solicitation activities. Gould-National Batteries, Inc. et al. v. Sonotone Corporation et al., 130 USPQ 26, 39 (DC N. Ill.—1961), and the cases cited therein.

### Disposition of Issues of Plaintiff's Complaint.

A. Background of Controversy.

8. PER is a corporation organized in the 1940's to engage in research relating to the photoengraving industry. PER's membership includes photoengravers (companies engaging in preparation of photoengravings) and supplier organizations (manufacturers and suppliers of equipment for photoengravers). At the time of trial, PER's membership included about 160 organizations. There are an estimated 2,000 photoengravers in the country. Mr. George Beck, President of Defendant, testified that photoengravers may be classified as "large" (those doing business in excess of $1,000,000 per year) and others. About 90% of the "large" photoengravers are members of PER.

Present fees for those photoengravers joining PER are $2,400 for the first three years of membership, which includes an initiation fee of $1,350, and annual dues of $350 per year. Each member of PER is automatically licensed under all patents and developments owned by PER (PX-1).

Companies, such as Chemco Photoproducts Company, Inc., hereinafter referred to as "Chemco," Philip A. Hunt Company, hereinafter referred to as "Hunt," and Master Etching Machine Co., hereinafter referred to as "Master," are suppliers of materials to photoengravers and also are members of PER.

The International Photo Engravers Union of North America (IPEW), hereinafter referred to as "Union," is a member of PER and, in 1959, the Union contributed $10,000 to PER on the condition that the Union got a voice (a seat) on the Board of Directors. The Union publishes a trade magazine. "The American Photo Engravers," which is one of two principal trade magazines.

The American Photoengravers Association, hereinafter referred to as "Asso-

ciation," is a trade association of employers having a membership of about 500. The Association publishes the other principal trade magazine "The Photoengravers Bulletin" having a circulation of about 2200. The Association contributed $15,000 to PER in 1959. One Mr. E. B. Brooks, a member of the Board of Directors of PER, happens also to be President of the Association.

9. For many years long prior to the filing date of the Jones Patent No. 2,746,848, the etching of photo-engravings of magnesium, zinc, copper and their alloys, required the use of "etching powder" or "dragon's blood" (as it was referred to in the trade) to protect the side walls of the etched regions from being eaten away by the etching solution. This established method of preparing photoengravings is briefly described in the Jones patent (col. 1, line 61—col. 2, line 16) and more fully described in the prior art patent of Easley et al. No. 2,640,763 (col. 1, line 40—col. 2, line 40). The so-called "dragon's blood" process was time-consuming and thus presented a problem for photoengravers.

In 1951, Easley et al., of The Dow Chemical Company, devised a method of making etched photoengravings of magnesium, zinc and their alloys, which method eliminated the time-consuming "dragon's blood" process. The Easley et al. process, hereinafter also referred to as the "Dow Process," is described in Patent No. 2,640,763, dated June 2, 1953. The Dow Process is based upon the discovery that the addition of certain agents to the acidic etching solution produced a removable acid-resistant film which controlled the rate of lateral etch.

In the acid etching of photoengravings of magnesium, zinc and their alloys, the etching solution then regularly used was a nitric acid solution. Easley et al. disclosed a number of specific agents (additives) which when added to the nitric acid etching solution yielded the desirable acid-resistant film, and eliminated the use of "dragon's blood."

In the etching of photoengravings of copper and brass (an alloy of copper and zinc), the etching solution regularly used is a ferric chloride etching solution. The Jones Patent No. 2,746,848 (filed January 19, 1955) suggests use of thiourea as an additive in a ferric chloride etching solution for producing a removable acid-resistant film, for the purpose of controlling rate of lateral etch.

10. The Jones process was never used commercially. In 1956, PER developed a new chemical additive for use with ferric chloride etching solution in the preparation of copper photoengravings. The new chemical was known as "GT–1." GT–1 was first made available for use in 1956. PER later licensed Hunt and Chemco to manufacture GT–1 for sale to PER's members. The use of GT–1 has been exploited as "powderless copper etching" (DX 9, 10). PER licensed Chemco and Master to make machines for use in "powderless etching of copper." (PX 20).

11. Bruno Giovannoni, hereinafter referred to as "Giovannoni," became aware of the Master "powderless etching" machine and GT–1 additive (not covered by the Jones patent) in 1958, when employed at Hutchings & Melville. Being dissatisfied with results of use of the machine and additive, he together with James Lavin, hereinafter referred to as "Lavin," first provided for their employer an improved machine and then engaged in experimentation to develop additives which would accomplish the powderless etching of copper where GT–1, in their view, was unsatisfactory. Through hit-and-miss-type experimentation, and using kitchen-type tests of samples of metal in little beakers of liquid, Giovannoni and Lavin stumbled onto a combination of materials for use as a successful additive, which combination included, among other things, a well-known commercially marketed chemical known as "thiourea."

When their employer, Hutchings & Melville, exhibited no interest in making and selling either machines or additive to others, and since both Giovannoni and Lavin were aware that the photoengraving industry was looking for improved

devices to assist in commercial use of powderless etching of copper, they formed the Plaintiff corporation, Angel, and began to manufacture and sell their additive to those photo-engravers who had "powderless etching" machines.

12. The stimulus for the present conflict between the parties arose when PER discovered that Angel's sale of "Di-Etch" was in competition with its GT–1 additive, then being manufactured and sold by Hunt and Chemco. Angel presented a problem to PER for a number of reasons. First, Angel's product was directly competitive with PER's GT–1 additive. Second, it was PER's avowed desire and purpose to channel all research activities relating to photoengraving into its organization. Apparently, PER felt that it could retain its membership only if it were the source of improvements in the industry. Third, Angel's program of selling additives to photoengravers, including those not members of PER, and who had purchased powderless etching machines made by Master and Chemco, permitted these non-members to make commercial use of those machines without joining PER. Previously, non-members could not use these machines since Hunt and Chemco had contractually agreed with PER not to sell the GT–1 additive to photoengravers not members of PER. Since each new member was required to pay PER $2,400 for the first three years of membership, Angel's activities seriously interfered with PER's ability to raise money. Fourth, inherently there was a threat to PER in that if members of PER could buy satisfactory additive materials on the open market without joining PER, then some of these members might discontinue their PER membership.

It is thus evident that Angel's sales constituted a vital threat to "the very survival of PER." This threat was actually asserted in an unsigned letter of 27 April 1960 (PX 27) from Chemco to Dr. Marvin Rogers, the executive director of PER, the pertinent portions of which letter are as follows:

"Dr. Marvin C. Rogers
Photo-Engravers Research, Inc.
2043 Cummings Lane
Flossmoor, Illinois
"Dear Marvin:
 * * *

"With respect to the Angel consideration, I do not believe that you are approaching it in a manner best suited to protect PER's interest. You suggest that 'the real losers when they go to members with their (Angel) materials, are Chemco and Hunt; and PER in the loss of royalty'. My analysis of the situation is that Chemco and Hunt are only temporary losers and PER is a total loser, because it is only with the assurance of patent protection that any supplier will undertake the manufacture of materials invented by a research group, such as PER. If you are to withdraw that promised protection by not prosecuting to the utmost (whether it be PER members or not) you will find yourself at a loss to find suppliers for the products of your laboratory.

"I say to you in all earnestness, if Angel is operating in violation of PER patents, you had better put a stop to it pretty quick. If they are not operating in violation of PER patents, then there is little point in any supplier trying to compete on a 'royalty basis'. In other words, the situation becomes economically untenable.

"I have not yet had an opportunity to discuss this in detail with either A. J. Powers or Don Alnutt, and if you like, you can regard this as my personal opinion of this situation. What it boils down to is PER must show an economic advantage to a supplier if PER expects cooperation. I haven't yet found a businessman who is in business for any reason except to make money.

"Let me reiterate. If you can put a stop to Angel, you better do it as

promptly as possible, not for the good of Hunt or Chemco, but for the very survival of PER."

13. To combat the threat from Angel, PER selected two weapons. First, PER charged Angel's product to be an infringement of the Jones patent though PER at the time knew (a) that the chemical disclosed in the Jones patent had never been commercially successful and (b) PER knew that the Jones patent did not cover the GT-1 additive which PER's licensees were then selling to PER's members. Second, PER, through its executive director, Dr. Marvin Rogers, and under the prodding of its supplier members Hunt and Chemco, organized and proceeded with a publicity campaign through the established trade publications, to threaten and intimidate all photoengravers who used Angel's products or who contemplated using Angel's products, including members of PER who were licensed under all of PER's developments and hence were free of any possible charge of patent infringement.

Dr. Rogers' campaign was founded upon the approach of publicizing threat of infringement against all photoengravers whether or not they were members of PER. Thus, beginning in 1959 and up to the filing of the Complaint herein, Dr. Rogers, who was editor of PER's "Newsletter" (which was sent out only to PER's members) arranged to have a statement concerning patents and patent infringement inserted in successive issues of the PER "Newsletter" identified as follows:

No. 4, August 1959 (PX 4)
No. 5, Nov. 20, 1959 (PX 21)
No. 6, Dec. 1959-Jan. 1960 (PX 22)
No. 7, Feb.-March 1960 (PX 5)
No. 8, April-May 1960 (PX 23)
No. 9, June 1960 (PX 24)

In furtherance of PER's "campaign" to eliminate Angel as a competitor, Dr. Rogers arranged to have published in the Photoengravers Bulletin of February 1960 a full-page notice (PX 11-B) titled "To The Photoengraving Industry" and containing therein the general charge "* * * that any photoengraver who uses the etching bath protected by the Jones patent, or who uses the processes protected by the Jones patent is an infringer". In order to bring this "general warning" (PX 32) directly to the attention of PER members, the PER Newsletter No. 7 of Feb.-March 1960 (PX 7) specifically called attention to the said notice in the Photoengravers Bulletin.

These charges of patent infringement were intended to be broad enough to constitute threats against PER members. These threats against PER members were made by PER despite the fact that PER knew, or should have known, that all of PER's members were perfectly free to buy Angel's, or anyone else's, products without any threat of infringement under the Jones patent.

Association published PER's notice "To the Photoengraving Industry" in February, 1960 without charge to PER. Later when Angel sought to submit a paid ad explaining Angel's position in "The Photoengravers Bulletin", Association refused to accept such ad.

14. When The Harold M. Pitman Company of Chicago, a member of PER, published a news item in their May, 1960 trade bulletin (PX 33) describing Angel's new machine for use in powderless deep-etching on copper plates, Dr. Rogers, Executive Director of PER, (a) called the Pitman Co. to task for publishing the news item, although Pitman was a member of PER and was licensed, (b) brought up the charge of infringement of Jones Patent No. 2,746,848 despite the fact that the news item described a "machine" while PER had no patents on machines, and (c) solicited "the cooperation of the Pitman Company in discouraging or preventing the infringement of this patent which has meant so much to the industry * * *" (emphasis added), when in fact the industry had never commercially used the Jones patent (PX 34).

15. Lavin testified that after the instant case was begun, the Chicago Local of the Union ordered a "boycott" of Angel's products. Mr. Beck, President of PER, admitted that he heard of a "boy-

cott", but that he immediately called the Union and told them to discontinue such action. Lavin testified that at a meeting with Local representatives of the Union (wherein was involved the issue of the Union's suspension of Lavin and Giovannoni for activities not relevant to this lawsuit), the Local's President Hall stated, on the question of why the "boycott" was imposed: "What did you expect? You sued us."

B. Validity and Infringement Issues.

16. The Jones Patent No. 2,746,848 has ten claims. Plaintiff's Declaratory Judgment Complaint seeks a decision by this Court on the question of validity and infringement of all claims of the patent. At trial, Defendant stated it relies only on Claims 4–7. Defendant has not taken any position with respect to charge of infringement of Claims 1–3 and 8–10.

Claim 1 of the Jones patent is directed to a ferric chloride etching solution containing thiourea in a specific concentration.

Claims 2 and 3 call for a process of etching photoengraving copper wherein there is broadly recited the step of "contacting" both the masked and unmasked portions of the copper with an aqueous ferric chloride etching solution containing thiourea.

In the remaining Claims 4–10, Claims 4, 6 and 8 are base claims with subsequent claims written in dependent form. Each of the base Claims 4, 6 and 8 differs from Claims 2 and 3 in reciting, inter alia, the step of "impinging" the etching solution upon both the masked and unmasked portions of the copper. The fact that the engagement between the etching solution and the photoengraving copper is by "contacting", as specified in Claims 2 and 3, or by "impinging", as specified in Claims 4–10, may be significant, as will appear hereinafter.

17. PER's Executive Director, Dr. Rogers, testified that a photoengraving may be immersed in a quiescent etching solution, or may be brushed with etching solution, or may be subjected to splash of etching solution, or may be subjected to directed impingement of etching solution from a spray nozzle or a jet stream, all as disclosed in the Jones patent. The Jones specification uses the term "impinging" only in conjunction with the description of the tests involving the spray nozzle or the jet stream. The Witness Lavin testified that there is random splash of the etching solution in a paddle-type splash machine. Dr. Rogers testified that in the paddle-type splash machine, the splash goes in different directions, depending upon the relative positioning of the paddlewheel in the liquid.

18. Angel asserts as one defense that the claims of the patent are invalid as being inoperative. Lavin, an experienced photoengraver, testified that the use of ferric chloride etching solution containing thiourea in a concentration within the range claimed in the Jones patent was found to be inoperable when the photoengraving was merely immersed in the etching solution, or when the photoengraving was subject to brushing in the etching solution, or when the photoengraving was subjected to splash of etching solution from a paddle-type machine. Dr. Rogers admitted that if a photoengraving is merely immersed in a ferric chloride etching solution containing thiourea in the concentration specified in Claim 1, so that the etching solution contracts both masked and unmasked portions of the copper, there would be no satisfactory or commercially-acceptable etching.

Practice has shown that the solutions disclosed in the Jones patent require ageing for at least thirty-six hours to have the desired effect. This requirement of ageing is a serious disadvantage. The Jones patent does not disclose or suggest that an aged solution will provide improved results. The effect of ageing on the Jones bath was discovered long after the application for the Jones patent was filed. The use of thiourea in the manner taught by Jones is not considered by PER to be satisfactory for commercial etching. The disclosure in the Jones patent does not disclose an operative commercial proc-

ess. It would have required independent testing and experimentation to discover the proper way of operating with the solution disclosed in the Jones patent.

Tests by PER's witness Borth with a paddle-type splash machine on non-commercial target plates failed to duplicate the test results disclosed in the Jones patent.

19. If the word "impinging" in Claims 4, 6 and 8 is construed to cover the use of paddle-type splash machines, then those claims are invalid as being inoperative. On the other hand, if the term "impinging" relates to the use of a spray nozzle or jet stream, as is suggested by the manner in which the term "impinging" is used in the Jones specification, then the record is silent as to whether or not the claimed methods are inoperable. However, the record is clear that there is no possible infringement of those claims, since there is no evidence that any of the Plaintiff's materials were ever used or intended to be used in a method utilizing a spray nozzle or jet stream. The Court further finds that the term "impinging" in Claims 4, 6 and 8 does not read on processes practiced in paddle-type splash machines.

20. Angel also asserts invalidity of the subject patent as lacking invention over the prior art. Angel relies upon two prior art references, Easley et al. 2,640,763, dated June 2, 1953, which describes the Dow Process as referred to hereinabove in Finding 9. The second reference relied upon is Cardwell et al. 2,485,529, dated October 18, 1949.

Easley et al. not only discloses the concept of powderless etching of magnesium, zinc, and their alloys, but also discloses that the powderless etching process requires adding a film-forming additive to the nitric acid etching solution. Easley et al. also discloses practice of the powderless etching process with either a paddle-type splash machine or with an atomizing nozzle for "strongly impinging the acid solution against the plate" whose surface is both masked and unmasked.

Cardwell et al., while being directed to a "Composition For Removing Scale From Ferrous Metal Surfaces", is of broader scope in certain respects, since the results of a number of theoretical experiments are described in this patent. Cardwell et al. discloses that when ferric iron is dissolved in hydrochloric acid, the acid solution acquires an added corrosiveness which increases the rate of attack of the solution on the metal in the solution. Cardwell et al. discloses that urea or derivatives thereof, such as thiourea, when combined with a soluble thiocyanate, reduced the attack of the solution on the metal. In order to determine and explain the mechanisms involved, Cardwell et al. performed and reported a series of experiments (Col. 3, line 42 et seq.). In one experiment, Cardwell determined that the addition of 1% of ferric iron as ferric chloride in a hydrochloric acid solution increased the corrosiveness of the solution more than 72%.

In other experiments, Cardwell measured the ability of certain additives to inhibit the corrosiveness of the solution that contained ferric chloride. In one experiment, Cardwell et al. reported that the corrosion rate of the solution containing ferric chloride was 1.179 lbs. per sq. ft. per day. In another experiment, Cardwell et al. reported that adding thiourea to the solution containing ferric chloride reduced the corrosion rate to 1.005 lbs. per sq. ft. per day. Cardwell et al. thus disclosed to those skilled in the art that thiourea has an inhibiting effect on corrosion rate of solutions containing ferric chloride.

The effective concentrations suggested by Cardwell et al. for urea derivatives is 0.05 to 0.1 per cent by weight. This range of concentrations encompasses the precise range of concentrations for thiourea that is disclosed in the Jones patent.

The mechanism of attack by ferric chloride on both steel and copper is the same. It would be logical that one who knew that thiourea inhibited the corrosiveness of ferric chloride on steel would

test to see if the same effect was obtained when used on copper.

It was established art to use ferric chloride etching solution for copper and brass. There is no invention in the disclosure of Jones that the use of thiourea in a ferric chloride etching solution would inhibit corrosive attack by the ferric chloride solution in a lateral direction. There is no invention in the claimed steps of using a ferric chloride etching solution containing thiourea, since the steps of the claims for use were fully disclosed by Easley et al.

When Jones tried to patent the broad concept of "an aqueous ferric chloride etching solution containing thiourea", such claim was rejected by the Patent Examiner for lack of invention over the prior art (PX 42, pages 12, 16). Jones acquiesced in the Examiner's rejection of claim to this concept by cancelling Claim 3 of the application as originally filed. Jones may not now recapture that which he abandoned during prosecution of his application.

C. Misuse of Patent.

■ 21. PER's contract with its members contains the provision:

"3. That first party (PER) will make available to second party, without additional cost to second party, such patents, improvements and processes as it may from time to time develop, it being specifically agreed that the same may be used by second party only so long as this Agreement, or a renewal or extension thereof, shall remain in effect." (PX 1.)

While PER entered into agreements with certain of its members, Hunt and Chemco, licensing them to make and sell GT-1, PER refused to make available to its other members the details of the improvements and processes relating to GT-1. The reasons for refusal were to exercise "control" of the chemical after it was sold, and to create limited supply for economic reasons. Thus, PER stated:

"The Chemicals required are patented and *if we gave everyone the formula we could not control its use.*" (Emphasis added.) (PX 6).

and again

"As soon as we have sufficient members to make it worth while, we will be glad to give you a license to manufacture our GT-1." (PX 29B).

22. PER licensed Hunt and Chemco to make and sell unpatented GT-1 additive at a royalty payable to PER of 10% of net selling price. Under the terms of the license, Hunt and Chemco could make sales of unpatented additive only to members of PER (DX 9, 10). The latter contract provision, unsupported by a valid patent, is an unreasonable restraint of trade and violates the anti-trust laws.

■ When members of PER who had bought GT-1 from a licensed source attempted to redistribute or resell GT-1 to others, PER prohibited such redistribution or resale to persons who were not members of PER (PX 30, 31). This prohibition against redistribution is an unreasonable restraint of trade and violates the anti-trust laws 15 U.S.C. § 1. United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408.

■ Chemco and Master, manufacturers of photoengraving equipment, entered into a license agreement with PER on January 12, 1958 to pay royalties to PER "on all machines sold, designed for the powderless etching of copper", at the rate of 5% if the machine costs approximately $2,000 and 3% if the cost of the machine is appreciably more than $2,000 (PX 20). PER refused to permit sale of unpatented GT-1 additive to those who had purchased licensed powderless etching machines from Chemco and Master, unless the purchaser also joined PER. This restriction is an unreasonable restraint of trade and violates the anti-trust laws 15 U.S.C. § 1. Morton Salt v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, B. B. Chemical Co. v. Ellis et al., 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367, United States v. Univis Lens Co., supra.

23. Since the Jones Patent No. 2,746,848 does not claim the additive per se, both Plaintiff's "Di-Etch" and GT-1 sold by Defendant's licensees Hunt and Chemco are unpatented materials. Neither of the parties to this suit practices the invention. The Defendant has sought to employ the Jones patent to protect a market for a material on which no patent has been granted. Such restraint on trade runs contrary to the antitrust laws. Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 667, 64 S.Ct. 268, 272, 88 L.Ed. 376.

Control over the supply of an unpatented material is beyond the scope of any legal monopoly which the Defendant may have had as a result of the Jones patent, regardless of the character of the material or the way in which it is used. Carbide Corporation of America v. American Patent Development Corp., 283 U.S. 27, 33, 51 S.Ct. 334, 336, 75 L.Ed. 819. It makes no difference that the unpatented material is, or could be, used as part of the patented process. Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 667, 64 S.Ct. 268, 272, 88 L.Ed. 376.

D. Creation of Monopoly and Injury to Plaintiff's Business.

24. In the first six months of its operations, beginning in the latter months of 1959, Angel's sales amounted to about $13,000. Angel's business decreased as the PER campaign of charging infringement of the Jones patent progressed. At the time of trial, Angel's business was practically non-existent. Angel's business was injured by the acts done in furtherance of PER's program to eliminate Angel as a competitor to PER's licensees, Hunt, Chemco and Master.

25. PER, in combination, cooperation and/or conspiracy with Hunt, Chemco, Union, and Association, planned and acted to deflect the natural course of trade in Angel's goods. Angel was injured in its business by the acts done in furtherance of the combination, cooperation and/or conspiracy to eliminate Angel as a competitor. The means utilized by PER and those acting in concert with it were unlawful and unfair. The destruction of Angel's business was the result of the combination, cooperation, and/or conspiracy in restraint of trade, and this was unlawful under the provisions of 15 U.S.C. § 1. The acts of PER were deliberate and wilful.

PER and those in combination with it desired and sought to create a monopoly in the manufacture and sale of additives for use in powderless etching of copper. PER was not entitled to a monopoly on the additives per se. By the destruction of Angel's business, PER achieved such a monopoly for its licensees Hunt and Chemco.

PER's membership encompassed 90% of the large photoengravers of copper in the United States. This group represented a substantial and significant segment of a specific industry group who were potential consumers of the competitive goods of Angel and PER's licensees. Although this segment of the market was free of the Jones patent to purchase additives from whomsoever they wished, PER deliberately and unfairly intimidated and threatened this segment of the market with the Jones patent, thereby destroying Angel's business with, and potential for doing business with this segment of the market.

Conclusions of Law.

1. This Court has jurisdiction of the parties and the subject matter of the Action.

2. Claims 1–3 of Patent No. 2,746,848 are invalid as being too broad and inoperable. If Claims 4–7 of Patent No. 2,746,848 are interpreted to cover processes performed with paddle-type splash machines, then said Claims 4–7 are invalid as being too broad and inoperable.

3. Claims 1–10 of Patent No. 2,746,848 are invalid as failing to disclose patentable invention over the prior art.

4. Plaintiff's sale of its goods to members of Defendant is not an act of infringement or contributory infringement of Jones Patent No. 2,746,848.

5. Plaintiff has not directly infringed any of the claims of Jones Patent No. 2,-746,848.

6. Plaintiff is not a contributory infringer of any claim of Jones Patent No. 2,746,848.

7. The Jones patent is unenforceable by reason of Defendant's misuse of the Jones Patent No. 2,746,848 and by reason of Defendant's acts in violation of the anti-trust laws.

8. The Defendant and those in combination, cooperation, and/or conspiracy with Defendant have performed acts with the purpose and intent to create a monopoly in the sale of additives for powderless etching of copper, thereby injuring Plaintiff.

9. The representations, threats and acts by Defendant seeking to enforce Jones Patent No. 2,746,848 against Plaintiff and Plaintiff's customers and/or intended to interfere with Plaintiff's sale of its products, and/or intended to destroy Plaintiff's business, are in violation of the antitrust laws and have resulted in substantial damage to Plaintiff's established business and prospective business.

10. Plaintiff is entitled to an accounting before a Master to be hereinafter appointed by the Court to make a finding as to the amount of damages Plaintiff has suffered, which finding of damage shall be trebled in view of the wilfulness of Defendant's acts.

11. Plaintiff is entitled to reasonable attorneys' fees, including attorneys' fees before the Master, and costs.

12. The law is with Plaintiff and against Defendant on each of the issues of Plaintiff's Complaint and Defendant's Answer and Counterclaim, and Plaintiff's Answer to said Counterclaim.

### Judgment.

13. Plaintiff is entitled to injunctions (a) restraining Defendant from further asserting the Jones Patent No. 2,746,848 against Plaintiff or against any of Plaintiff's customers or Defendant's members, and (b) restraining Defendant from fur-

ther violations of the anti-trust laws as herein found.

14. Defendant's Counterclaim is dismissed for failure to introduce any evidence upon which to predicate a prima facie finding of any direct infringement.