**UNITED STATES of America,**
**Plaintiff,**

v.

**HUCK MANUFACTURING COMPANY**
**and Townsend Company,**
**Defendants.**

**Civ. A. No. 21791.**

United States District Court
E. D. Michigan, S. D.

Feb. 27, 1964.

---

Lee Loevinger, Asst. Atty. Gen., Washington, D. C., Jack L. Lipson, Charles R. Esherick, Attys., Dept. of Justice, Washington, D. C., Lawrence Gubow, U. S. Dist. Atty., William Merrill, Chief Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Arthur W. Dickey, John C. Sterrett, Harness, Dickey & Pierce, Detroit, Mich., Albert M. Stern, Stern & Rossier, Detroit, Mich., for defendant Huck Mfg. Co.

W. Walter Braham, Jr., Thomas W. Pomeroy, Jr., Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa. (Daniel J. Tindall, Jr., Dickenson, Wright, McKean & Cudlip, Detroit, Mich., of counsel), for Townsend Co.

MACHROWICZ, District Judge.

### Status of Case

This is a civil action upon complaint of United States of America against the defendants under 15 U.S.C. § 4 to prevent and restrain alleged combination and conspiracy by defendants in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2.

Jurisdiction of the subject matter hereof and proper venue of the parties hereto duly appear and are conceded by the parties.

On the date of filing the Complaint herein, October 24, 1961, plaintiff also instituted criminal action No. 39017 in this Court on indictment of the defendants for the same alleged violations of the Sherman Act that are alleged in this civil action.

The criminal action was tried before the Honorable Fred W. Kaess, U. S. District Judge in this Court, and a jury, February 26, 1963 through March 12, 1963. At the close of the Government's case on March 13, 1963, the defendants moved the Court for judgments of acquittal, which were granted, on the ground that the Government had not by its evidence established the Sherman Act violations alleged in the indictment. The opinion and order contained the following paragraph, summarizing the reason for the granting of the motion for judgment of acquittal

"To conclude, it has not been shown that the object of defendants' patent arrangement was to secure a greater reward than that attributable to the superiority of the products, or to achieve monopoly power."

Thereafter by stipulation of the parties herein, the record of proceedings in the said criminal action, No. 39017, was introduced in evidence in this civil action subject to all the objections appearing therein, as constituting the Government's case in chief in this action, on which the Government rests; it being further stipulated that the defendants in this action may move for dismissal of this action on that record, pursuant to the Federal Rules of Civil Procedure. The applicable rule is Rule 41(b), providing that:

"After the plaintiff, in an action tried by the court without a jury has completed the presentation of his evidence the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)."

### The Pleadings.

The Complaint in this case (Par. 14) alleges that:

"Beginning at least as early as 1954, the exact date being to the plaintiff unknown, and continuing thereafter up to and including the date of the filing of this complaint, the defendants have engaged in a combination and conspiracy in unreasonable restraint of trade and to monopolize the aforesaid interstate trade and commerce in lockbolts in violation of Sections 1 and 2 of the Sherman Act. The unlawful combination and conspiracy is continuing and will continue unless the

relief hereinafter prayed for is granted."

The Complaint further alleges (Par. 15):

"The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants, the substantial terms of which have been and are:

"(a) to fix and maintain prices, terms and conditions for the sale of lockbolts manufactured in the United States by defendants who are the only producers of a general line of lockbolts;

"(b) To limit the number of licensees permitted to manufacture lockbolts;

"(c) To require the consent of the only general licensee before the patent owner is allowed to license any other firm for the production of its general line of lockbolts;

"(d) To have the defendants who are the two dominant manufacturers of lockbolts cross license each other on all improvements of and substitutes for lockbolts which might in the future be developed by either defendant."

The Complaint (Par. 5) defines "lockbolt" to mean a two-part metal fastening device used to permanently join together two or more pieces of metal in the manner illustrated by Appendices "A" and "B" attached to the Complaint.

The Complaint further alleges (Par. 6) that lockbolts are patented devices, are produced in various shapes and sizes depending on the use for which they are intended, and are constructed of a number of different metals including alloy steels, aluminum and titanium.

The Complaint (Pars. 7–10) states that the majority of all lockbolts are designed for use in the airframe manufacturing industry, and are used to hold together the wings and body of aircraft; also in manufacture of truck trailers, house trailers, railroad cars and ships, United States naval vessels, and other industrial applications where formerly a nut and bolt or rivet or other fastener would have been used. That a lockbolt is superior to the ordinary rivet in that the lockbolt pin can be made of metal strong enough to withstand sheering action; that unlike the rivet the lockbolt pulls together the pieces of metal being joined and eliminates sheet-gap; that unlike a nut and bolt a lockbolt cannot be loosened by vibration or passage of time. That other devices also used to join pieces of metal have not the peculiar advantages of lockbolts; that in the aircraft manufacturing industry, once the lockbolt has been specified by the manufacturer's engineering staff, other devices cannot thereafter readily be substituted.

The Complaint further states (Par. 11) that lockbolts are manufactured and sold by defendant, Huck Manufacturing Company, under patents assigned to it. That Huck Manufacturing Company has licensed defendant Townsend Company to manufacture and sell a general line of lockbolts and has also licensed two other firms to manufacture and sell lockbolts of titanium only.

The Complaint (Par. 13) further states that lockbolts sold in the United States in recent years were valued at approximately Sixteen Million Dollars, ($16,000,000.00) annually.

Defendants, answering the Complaint, deny that they have or are engaged in a combination and conspiracy in unreasonable restraint of trade and to monopolize interstate trade and commerce in lockbolts in violation of Sections 1 and 2 of the Sherman Act, deny that the alleged unlawful combination and conspiracy is continuing and will continue, and deny paragraphs 15, 16 and 17 of the Complaint, alleging respectively a continuing agreement, understanding and concerted action among defendants constituting the alleged unlawful combination and conspiracy; and deny that in formulating and effectuating the al-

leged unlawful combination and conspiracy they have entered into the various agreements and done various things and performed the various acts alleged in paragraph 16 of the Complaint, and deny the effects of the alleged unlawful combination and conspiracy alleged in paragraph 17 of the Complaint, and deny that plaintiffs are entitled to relief demanded by the Complaint.

Defendants, by answer, admit that lockbolts are patented devices, that they are manufactured and sold by defendant Huck Manufacturing Company under patents assigned to it, and that Huck Manufacturing Company has licensed defendant Townsend Company under such patents; that the major portion of lockbolts produced by defendants are designed to meet the standards of the airplane industry and that the same are used in the construction of aircraft; aver that lockbolts are a small proportion of fastening devices used in the construction of aircraft; admit that lockbolts are used in the manufacture and repair of truck trailers, house trailers, railroad cars and ships, including United States naval vessels, and other industrial applications; and aver that many types of fasteners other than lockbolts are likewise used; aver that lockbolts have some advantages over other devices used to join individual pieces of metal, and that other devices used to join individual pieces of metal have advantages that lockbolts do not have; aver that the aircraft manufacturers have a choice of fastening devices to be used to fasten together the parts of any airplane under design and admit that whatever fastening devices are chosen, other fastening devices cannot thereafter be readily substituted, and aver that this holds true whether a lockbolt is to be substituted for another fastening device originally selected or whether another fastening device is to be substituted for the lockbolt originally selected.

The contention of the Government that emerges from pleadings, evidence and arguments and briefs in this case is that violations of Sections 1 and 2 of the Sherman Act have occurred by reason of alleged combination and conspiracy by and between defendants in unreasonable restraint of trade and to monopolize interstate trade and commerce in lockbolts conceded to be subject of and covered by valid and subsisting United States patents owned by defendant Huck Manufacturing Company, by reason of alleged illegality of license agreement between Huck and Townsend, in the respect that there was an understanding between defendants that Huck would not license any third parties under its lockbolt patents, except for special kinds of lockbolts subject to those patents that neither Huck nor Townsend were interested in manufacturing, in return for Townsend's agreement to follow Huck's prices, terms and conditions of sale for the patented lockbolts, for so long as Huck did not license any third parties to manufacture and sell Huck's patented lockbolts; that Huck thereby illegally restrained itself from granting licenses to others to manufacture and sell under its lockbolt patents; and that the prices, terms and conditions of sale for the patented lockbolts were illegally fixed by the parties.

The defendants contend that the licensing arrangements between themselves are valid and legal and that their operations under the license agreement do not exceed the bounds of that conduct permitted to a patentee and licensee under valid patents as set forth in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852; United States v. E. I. DuPont DeNemours & Co., 118 F.Supp. 41, 224, D.C. Del.; Transparent-Wrap Machine Corporation v. Stokes & Smith Company, 329 U.S. 637, 645–648, 67 S.Ct. 610, 91 L.Ed. 563; Binks Manufacturing Co., v. Ransburg Electro-Coating Corp., 281 F.2d 252, 259 (C.A.7).

No jury having been demanded by any of the parties in the cause, and the defendants having duly moved under Rule 41(b) for dismissal of the action

on the ground that upon the facts and the law the plaintiff has shown no right to relief, and the Court as trier of the facts having duly heard the said motion in open court, upon the evidence presented by the plaintiff and having duly considered the evidence, the arguments of counsel for the respective parties in open court with respect thereto, and the briefs presented and filed by the respective parties with respect thereto, has determined the facts and now renders judgment against the plaintiff, and hereby makes its findings of fact and its conclusions of law thereon and directs entry of the appropriate judgment thereon as provided in Rule 52(a).

## FINDINGS OF FACT

1. Huck Manufacturing Company (hereinafter referred to as "Huck") is a corporation organized and existing under the laws of the State of Michigan, with general offices and principal place of business at 2500 Bellevue Avenue, Detroit, Michigan. Huck transacts business within the Eastern District of Michigan, Southern Division.

2. Townsend Company was at the beginning of this suit a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. It is now a Division of Textron Industries, Inc., a corporation organized and existing under the laws of the State of Delaware. The Townsend Company Division has general offices and its principal place of business in Beaver Falls, Pennsylvania. (Wherever hereinafter used, the name "Townsend" refers to Townsend Company, whatever its corporate organization at that time.) Townsend transacts business within the Eastern District of Michigan, Southern Division.

3. Huck manufactures the lockbolts in Detroit, Michigan, and sells the same throughout the State of Michigan and throughout the United States. (Complaint, Par. 3; R. 142)

4. Townsend manufactures the lockbolts in plants in Santa Ana, California, and Ellwood City, Pennsylvania. Townsend sells the same throughout the State of Michigan and throughout the United States. (Complaint, Par. 3)

5. The "lockbolt" is a two-part metal fastening device used to join together permanently two or more pieces of metal. The two parts are a "lockbolt pin" and a "lockbolt collar". The "lockbolt pin" is a metal pin having an enlarged head which abuts against one of the members being joined, a grooved portion about which the lockbolt collar is swaged and a grooved pintail which is gripped, pulled and broken off as the collar is swaged. The "lockbolt collar" is a cylindrical piece of metal designed to slip over the lockbolt pin and be swaged into its grooves. (Complaint, Par. 5, Appendices "A" and "B" attached to the Complaint; Townsend Answer, Par. 5; Huck Answer, Par. 5; R. 147–152)

6. Lockbolts are patented devices used to fasten together two or more pieces of metal. They are produced in various shapes and sizes depending on the use for which they are intended, and are constructed of a number of different metals including alloy steels, aluminum and titanium. (Complaint, Par. 6)

7. Lockbolts are used in the airframe manufacturing industry in the production of military and civilian jet and propeller-driven aircraft, in the manufacture and repair of truck trailers, house trailer, railroad cars and ships, including United States naval vessels, and in other industrial applications. The major portion of lockbolts manufactured by both defendants are used in the airframe manufacturing industry. (Townsend Answer, Par. 7; Huck Answer, Par. 7; R. 172)

8. Total sales of lockbolts in the United States by Huck and Townsend in the year 1960 amounted to Five Million Nine Hundred Seventy-seven Thousand Five Hundred Ninety-three and $^{96}/_{100}$ Dollars, ($5,977,593.96). (Exhibits 80 and 103)

9. Several types of fasteners other than lockbolts are used and usable for the same purposes as lockbolts. (R. 822–24)

10. The lockbolt was invented by Louis Huck, President and then principal stockholder of Huck Manufacturing Company. Huck Manufacturing Company is the owner of United States Patents Nos. 2,531,048 and 2,531,049 dated November 21, 1950, covering the lockbolts. These patents are conceded to be valid, subsisting and enforceable. (Pre-Trial Order covering Pre-Trial conference of October 1, 1962)

11. The lockbolts are and since 1950 have been manufactured and sold by Huck under the above-described lockbolt patents.

12. In 1951, after defendant Huck had entered upon the manufacture and sale of its patented lockbolts, defendant Townsend copied these lockbolts and entered into the manufacture and sale thereof in competition with Huck by infringing Huck's lockbolt patents; that Huck, then refusing to grant Townsend a license under its lockbolt patents, sued Townsend for infringement thereof, obtained in 1952–1953 a decision and judgment against Townsend, holding the patents to be valid and infringed by Townsend; that Townsend then again sought license under the patents and took an appeal from the judgment against it, and ceased the manufacture and sale of the lockbolts; that during the pendency of the appeal Huck, confronted by demand of its customers for a second source of supply for said lockbolts, and encountering delay in meeting delivery dates specified by its customers (R. 194, 197), reconsidered the advisability of granting Townsend's continued request for a license, and finally after negotiations with Townsend in the summer of 1954 did grant Townsend a written license under Huck lockbolt patents, dated September 14, 1954, which is Government Exhibit GX 17; and that after the grant of the license GX 17 Townsend's appeal from the judgment against it was dismissed, and the patent infringement suit pending between the parties thereby terminated.

13. In the negotiations between the parties in the summer of 1954, Huck took the position that it wanted to issue no more licenses under lockbolt patents than it believed would adequately supply the demand for the patented lockbolts and alleviate the difficulties it faced, namely, the demand of customers for a second source of supply, and delay in meeting delivery dates specified by the customers (Exhibits GX 74; 104). Townsend wanted to obtain an exclusive license under the lockbolt patents except for retention by Huck of its own right under the patents to manufacture and sell the lockbolts, and thereby obtain for Townsend as much as it could of the business of manufacturing and selling the patented lockbolts. (R. 211–213, 875–877)

14. The written license GX 17 includes the Huck lockbolt patents Nos. 2,531,048 and 2,531,049 granted November 21, 1950, expiring November 21, 1967, which were held valid and infringed by Townsend in the patent infringement suit between Huck and Townsend, grants Townsend a nonexclusive license to manufacture and sell lockbolts, improvements thereon and substitutes therefor of the same type covered by the licensed patents (Par. 1) for which Townsend agrees to pay Huck a royalty of five percent (5%) of the net selling price of the lockbolts manufactured and sold by Townsend and covered by the licensed patents (Par. 2), provides that Townsend grants Huck a nonexclusive royalty-free license with right to sublicense improvements on the lockbolts made or acquired by Townsend during the life of the license (Par. 8); provides that Townsend shall use its best efforts to manufacture and sell lockbolts up to at least 9/16″ pin diameter (Par. 9); provides that for lockbolts sold by Townsend as Huck equals with pin diameter up to 3/8″ Townsend shall maintain Huck's quality for full equivalence in shear tension and fatigue (Par. 10); provides that Townsend will identify the lockbolts manufactured and sold by it to distinguish them from the lockbolts manufactured and sold by Huck (Par. 11); that Huck will furnish Town-

send drawings and specifications it has for the lockbolts and know-how it has for the production of the lockbolts, and that Townsend will furnish Huck with know-how it may develop for the production of the lockbolts (Par. 17); provides that as Townsend will be required to expend considerable money to provide facilities for entering the manufacture and sale of lockbolts (Par. 12), that for the first two years the license shall be exclusive to Huck and Townsend except in case of national emergency (Par. 12a), and that Townsend during the two-year exclusive period shall maintain at least Huck's prices on lockbolts manufactured and sold by Huck according to Huck's published current price schedule as changed from time to time and computed according to Huck's published Standard Pricing Policy, and prescribed freight charge computation (Par. 12b); provides that Townsend may cancel the agreement at any time on six months' notice in writing to Huck (Par. 13); and (Par. 16) that unless previously terminated (by Huck in the event of Townsend's failure to pay royalties or breach of any material provision of the agreement) (Par. 6), or by cancellation by Townsend (Par. 13), the agreement and license shall extend for the full term of the United States Letters Patent which are or may be included in the agreement.

15. The Government adduced testimony from its principal witness Looker, a former employee and officer of Huck Manufacturing Company, to the effect that there was a verbal agreement between defendants Huck and Townsend, supplemental to the written patent license agreement GX 17 of September 14, 1954, that was in substance that Huck would continue the lockbolt patent license GX 17 exclusive to Townsend, and not grant licenses under the lockbolt patents to others so long as Townsend, for the patented lockbolts it manufactured and sold, maintained Huck's established prices on the lockbolts which Huck manufactured and sold.

It is the testimony of Looker that this alleged verbal agreement was made between Armour, President of Huck, and Dickenson, President of Townsend, at a meeting which occurred in the summer of 1954, during negotiations for and prior to the time the written lockbolt patent license GX 17 of September 14, 1954 was completed and signed by the parties.

Looker, after graduating from the Naval Academy and a short term of active service in the Navy, left the service in September, 1947, and became employed by defendant Huck Manufacturing Company under his stepfather Louis C. Huck, who was at that time President of Huck Manufacturing Company, first serving as a clerk in the sales office, then as manager of technical publications until 1952, then as Sales Manager until May, 1954, then as Vice President in Charge of Sales until August, 1956, when he voluntarily resigned upon acquiring an interest in the Brown-Line Corporation of El Segundo, California, in association with Milton A. Miner, then West Coast Sales Representative of Huck Manufacturing Company. Looker assumed presidency of the Brown-Line Corporation which was engaged in the manufacture of devices for holding down cargo, seats, etc., in airplanes. Looker, upon leaving Huck Manufacturing Company, endeavored to obtain a license for the Brown-Line Corporation from Huck Manufacturing Company under the Huck lockbolt patents. Huck Manufacturing Company refused to grant the license, but Looker continued his endeavors to obtain such license. These efforts being unsuccessful, he initiated in the Department of Justice and pressed and followed up the action of the Department which culminated in the criminal action No. 39017 and this present civil action. Prior to the trial of the criminal action, Looker caused the institution of suit in the United States District Court for the Southern District of California by Brown-Line Corporation against the defendants Huck Manufacturing Company

and Townsend Company under 15 U.S.C. § 15 for treble damages on account of alleged violation of the Sherman Act.

Subsequent to the grant of the lockbolt patent license by Huck Manufacturing Company to Townsend Company, GX 17 dated September 14, 1954, and prior to his resignation from Huck in 1956, Looker, inconsistent with his present contention that Huck was prohibited from granting licenses under its lockbolt patents to others than Townsend by the alleged verbal agreement with Townsend, recognized (R.566) that Huck Manufacturing Company was free to grant such licenses. He issued memoranda (Ex. DXY; GX 59) while employed by Huck during the period subsequent to the granting of the license GX 17 on September 14, 1954, contemplating the grant of such licenses, and also immediately upon leaving the employ of Huck and assuming the presidency of Brown-Line Corporation in 1956 sought such license from Huck for Brown-Line Corporation.

16. The verbal agreement or understanding which the Government contends was entered into by the parties as part of the written license agreement GX 17, completed and signed by the parties as of September 14, 1954, was in purport and effect to make or continue the lockbolt patent license exclusive to Townsend, except for retention by Huck of its own right under the patents to make and sell the patented lockbolts, for so long as Townsend maintained for the lockbolts which it manufactured and sold under the license, the prices, terms and conditions of sale Huck established for the lockbolts which Huck manufactured and sold under the title and rights it retained under the same patents. The verbal agreement was no more than the exercise by Huck of its right as the patent owner of the lockbolt patents to grant or extend an exclusive license to another (in this case, Townsend) for the unexpired term of those patents and to require as a condition thereof that its licensee sell the patented lockbolts, which it could legally manufacture only under the license, upon the terms and conditions of sale and prices established by Huck, and the exercise by Townsend of its right to agree to and accept such a patent license.

17. Huck, as owner of the patents and licensor, kept its customers and Townsend, its licensee under the patents, informed by published price lists of the prices, terms and conditions of sale of the patented lockbolts which Huck established and followed in the sale of lockbolts manufactured by it.

18. Townsend manufactured and sold the patented lockbolts under the license GX 17 and, except for occasional deviations, observed and followed substantially the same prices, terms and conditions of sale established and observed by Huck for the sale of the patented lockbolts which Huck manufactured.

19. There is no evidence in this case that the licensee Townsend was granted, or had, or exercised any power or authority to fix prices under Huck's lockbolt patents for Huck, the patent owner, or any other licensee under the Huck lockbolt patents to follow.

20. There have been various contacts between Huck, the patent owner, and Townsend, its licensee, since the patent license agreement GX 17 was entered into. These contacts, as disclosed by the testimony and documentary exhibits, have been in pursuance of the provisions of the patent license agreement GX 17 that the patented lockbolts produced by the two companies be interchangeable, that required quality be maintained, and that standards respecting sizes, finishes and lubricants applied in the manufacture of the patented lockbolts be followed. Such contacts have also been by way of interchanging information to make available technical developments and improvements in the patented lockbolts, and in installation tools and equipment, and respecting joint advertising, all attributable to the purpose of encouraging and increasing the use of the patented lockbolts in the trade. The Court finds that these contacts have been in furtherance of legiti-

mate, normal business motives permissible under the patent license, on the part of both Huck and Townsend, and have not been for the purpose of fixing prices or to enable Townsend to fix or dictate the prices charged for the patented lockbolts.

21. Huck lockbolt patents, under which Huck granted the license GX 17 to Townsend, are conceded to be valid and subsisting and to cover lockbolts which Townsend has manufactured and sold and is presently manufacturing and selling under the license GX 17.

22. Huck has granted no licenses to others than Townsend under its lockbolt patents, except for a nonexclusive license to Pheoll Manufacturing Co. dated September 26, 1956 (Government Exhibit GX 76), and a non-exclusive license to Standard Pressed Steel Co. dated October 4, 1956 (Government Exhibit GX 77), both of which were limited to the making and selling of lockbolts made of titanium which Huck and Townsend do not make, and neither of which require price maintenance.

Others than Townsend requested licenses under Huck's lockbolt patents, which Huck refused to grant. They are Brown-Line Corporation, Olympic Screw & Rivet Corporation, Illinois Tool Works, Pheoll Manufacturing Co., and Republic Steel Corporation.

These refusals by Huck Manufacturing Company are not shown to have been participated in by or known to defendant Townsend Company, or to have occurred otherwise than by Huck, in the exercise of its own judgment and right to select or reject prospective licensees and to prefer one over others for considerations within its discretion.

There is no evidence that Huck and Townsend could not adequately handle all available trade and commerce in the patented lockbolts.

23. On November 1, 1955 Huck granted a separate license to Townsend (Government Exhibit GX 19) in which Huck grants Townsend a nonexclusive license to make and sell lockbolt stumps and lockbolt collars, and Townsend grants back to Huck a nonexclusive license under improvements thereon which Townsend may make or acquire. There are no price maintenance requirements in this license. The stumps were not licensed under the license GX 17 of September 14, 1954.

On October 22, 1958 an agreement (Government Exhibit GX 70) was entered into between Huck and Townsend in which Huck and Townsend exchange options to obtain nonexclusive licenses from each other to manufacture and sell under each other's patents tools for installing or setting, and for removal, of lockbolt devices. Only nonexclusive licenses are obtainable by Townsend from Huck or by Huck from Townsend under this agreement. There are no price maintenance requirements in this agreement.

On October 22, 1958 Huck and Townsend entered into an agreement (Government Exhibit GX 71) in which provision was made for Townsend to purchase from Huck tools and equipment made by Huck for the installation and setting, or for the removal, of lockbolt devices; and for Huck to purchase from Townsend tools and equipment made by Townsend for the installation or setting, and for the removal, of lockbolt devices. There is nothing in this agreement which restricts or prevents Huck from selling its tools to anyone it chooses, and nothing in the agreement that prevents Townsend from selling its tools to anyone it chooses. There are no price maintenance requirements in this agreement.

On June 25, 1958 Huck entered into an agreement (Government Exhibit GX 72) granting to Townsend a nonexclusive license to manufacture and sell blind lockbolts, illustrated in the drawing Exhibit A attached to the agreement, according to Huck's know-how, specifications and engineering information, and Townsend grants back to Huck a nonexclusive license under improvements thereon which Townsend may make or acquire. This license contains no price maintenance requirements.

24. The so-called cross- or grant-back licenses from Townsend to Huck respecting Townsend's improvements do not in any way restrict or restrain Townsend's use, manufacture or sale of its own improvements, or Townsend's right to grant licenses to others under those improvements. They merely grant Huck the nonexclusive right or permission to make and sell such improvements in common with Townsend or anyone else Townsend may choose to license to make and sell such improvements. These grant-back clauses provide Huck with no power whatever to restrain or monopolize trade in Townsend's improvements. There is no evidence that they are used or have ever been used or are likely to be used to restrain or monopolize trade in Townsend's improvements.

There is no evidence that Townsend possesses or has in prospect any improvements or patents thereon which are or would be subject to the grant-back clauses. The grant-back clauses themselves are nonexclusive and provide no power for restraint or monopolization of Townsend improvements. They are, on the contrary, adverse to restraint or monopoly.

In GX 17, the lockbolt patent license of September 14, 1954, the grant-back complained of is Par. 8 of that agreement, which states:

"Townsend hereby grants to Huck a nonexclusive, royalty-free license, with the right to sublicense upon any improvements on said lockbolt devices made or acquired by Townsend during the life of this agreement coming within the claims of the licensed patent, or lockbolt devices of the same type which are substitutes of the lockbolts licensed herein by Huck."

This is merely a grant-back to Huck of a nonexclusive license with right to sublicense on Townsend's improvements. Being nonexclusive, it grants Huck no monopoly upon Townsend's improvements and no power to preclude Townsend or anyone else from making, selling and using those improvements. If the im-

provement happened to be one that was covered by Huck's own patents, then the only rights Huck would have with respect to it *would arise under its own patents* and not in any way under the nonexclusive grant-back provision of Par. 8. Consequently, the grant-back provision of Par. 8 grants no power to Huck over Townsend's patents on such improvements if any, and provides Huck with no power to prevent Townsend from making, selling or using those improvements or from licensing any others it chooses to do the same. Par. 12a, making the license granted by Huck to Townsend exclusive for the first two years, does not affect Par. 8, the grant-back by Townsend to Huck of a nonexclusive license on Townsend's improvements, for Par. 12a makes exclusive only the license which Huck grants to Townsend under Huck's own patents.

In GX 19, the separate license on stumps which are not included in or subject to GX 17, the grant-back provision is Par. 11, which states:

"Townsend hereby grants to Huck a nonexclusive, royalty-free license, with right to sub-license on any improvements on said licensed products made or acquired by Townsend during the life of this agreement, coming within the claims of the licensed patent, or products of the same type which are substitutes for the licensed products licensed herein by Huck."

This grant-back provision is entirely nonexclusive, grants Huck no monopoly power whatever over Townsend's improvements nor any right to prevent the manufacture, sale or use thereof by Townsend or any others whom Townsend chooses and is free to license.

In GX 70, the tool license option agreement, the grant-back provision by Townsend to Huck is Par. 7, which states:

"The right and license granted to Huck by Townsend under paragraph 3 above with respect to the elected license products identified by Huck

under paragraph 5 above shall include a nonexclusive right to license under any United States Letters Patent and applications for Letters Patent now owned or later acquired by Townsend with respect to said elected licensed products."

This is an entirely nonexclusive grant-back; it does not provide Huck with any monopoly or monopoly power over Townsend's improvements, nor any power to prevent the manufacture, sale or use of those improvements by Townsend or any others Townsend chooses and is free to license.

In GX 71, the sales agreement respecting tools, the grant-back provision is Par. 2, which reads as follows:

"Townsend hereby grants to Huck a nonexclusive right, during the term of this agreement, to sell the beforementioned and described products manufactured by or for Townsend, together with any parts of or replacement for said articles. Townsend agrees that it will make the aforesaid products available to Huck in common with other purchasers."

This grant-back is nonexclusive and only of a right to purchase and sell Townsend's tools in common with others. It gives Huck no monopoly power whatever over Townsend's tools, nor any power whatever to restrain or prevent Townsend's manufacture, use or sale of its tools or license any others to do. They are made available to Huck only in common with other purchasers.

In GX 72, the nonexclusive license from Huck to Townsend on blind lockbolts, the grant-back provision is Par. 11, as follows:

"Townsend hereby grants to Huck a nonexclusive, royalty-free license, with the right to sublicense on any improvements on said licensed products made or acquired by Townsend during the life of this agreement or products of the same type which are substitutes for the licensed products licensed herein by Huck."

This grants back to Huck only a nonexclusive license respecting Townsend's improvements. It grants Huck no monopoly power whatever over Townsend's improvements and no power whatever to restrain or prevent Townsend from making, selling or using Townsend improvements, or any others Townsend chooses and is free to license.

There is no agreement that prevents or restrains Townsend in any way from making, using or selling Townsend improvements on the lockbolts or licensing others to do the same.

There is no agreement that prevents or restrains Townsend in any way from developing and making and selling lockbolts that would be independent of and avoid Huck's lockbolt patents.

None of the separate licenses and agreements, GX 19, GX 70, GX 71 and GX 72, have any price fixing provisions or agreements whatever.

25. There is no evidence which indicates that the patent arrangement of Huck with Townsend was designed to or did secure to Huck other than a reasonable reward for the use of exclusive patent rights of which Huck was the owner by the grant to it of the lockbolt patents.

26. There is no evidence that the purchasers and users of the patented lockbolts buy or use them for any reasons other than to utilize the advantages peculiar to them, or that they are prevented or restrained from obtaining other fastening devices for like uses available and obtainable in the market at comparable prices.

27. There is evidence that there are fastening devices other than the patented lockbolts which can be and are used for the same purposes and which are regarded as competitive with the patented lockbolts (R.822–824), but there is no evidence in the record to define the industry or market in which the patented lockbolts and other fastening devices available for the same purposes and uses are being sold, or to show its magnitude.

28. There is no evidence from which the impact or effect of the combination and conspiracy alleged with respect to the patented lockbolts upon the market for the patented lockbolts and the other fastening devices used and usable for the same purposes can be evaluated or determined.

29. There is no evidence that Huck and Townsend had any intention to or did conspire to restrain or monopolize, or did restrain or monopolize, trade or commerce in lockbolts beyond the limits of the lawful patent monopoly granted to Huck as owner of the lockbolt patents.

## CONCLUSIONS OF LAW

■ I. The Government concedes that under the authority of the decision in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, the patent owner who manufactures and sells the patented articles can license another to make and sell the patented articles and require the licensee, with respect to the patented devices made and sold by the licensee under the licensor's patents, to observe and follow the licensor's prices, terms and conditions of sale.

■ This decision holds and establishes that it is not a violation of the Sherman Act for a patentee to grant a license to make, use and vend articles under the specifications of his patent for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure; that if the patentee licenses the manufacture and selling of the articles he may limit the selling by limiting the method of sale and the price, provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly; that one of the valuable elements of the exclusive right of the patentee is to acquire profit by the price at which the article is sold, the higher the price the greater the profit; that

when the patentee licenses another to make and vend and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods; that the requirement that the licensee adopt and maintain, for the patented devices which it can make legally only under the license, the terms and conditions of sale and prices established and observed by the licensor for the patented devices made by the licensor, is normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly, and does not violate the Sherman Act. This decision and authority has not been overruled.

In Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852, it is held and established that the patent law confers on the patentee a limited monopoly, right or power to exclude all others from the manufacturing, using or selling of his invention; that the extent of that right is limited by the definition of his invention as its boundaries are marked by the specifications and claims of the patent; that he may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction on the exercise of the grant and privilege, save only that by attaching a condition to his license he may not enlarge his monopoly and thus acquire some other which the statute and the patent together do not give.

In United States v. E. I. Du pont DeNemours & Co., 118 F.Supp. 41, 224, D. C.Del., it was held and established that the owner of the patents has the right to grant an exclusive license and that such a license in no way violates the provisions of the Sherman Act, and that the patentee has the right to license, including the right to select or reject prospective licensees and to prefer one over others for considerations within its discretion. This was not in any way modified or overruled on appeal to the Supreme Court, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.

II. The establishment or fixing of prices and terms and conditions of sale for the patented lockbolts by defendant Huck Manufacturing Company, the owner of the patents, which was followed by its licensee, defendant Townsend Company, for the lockbolts which it manufactured and sold under the license from Huck, is in all material respects the same as that established and held in the United States v. General Electric Co. case referred to above, not to be a violation of the Sherman Act.

■ III. In the case at bar there is no violation of the Sherman Act by Huck's establishment of the prices, terms and conditions of sale for the patented lockbolts and the following thereof by the licensee Townsend, for it is established law, under the General Electric case, that it is not violation of the Sherman Act for a licensee to follow the prices, terms and conditions of sale of the patent owner, by agreement to do so.

■ It is established law that it is not violation of the Sherman Act for Townsend, in the exercise of its own judgment, to follow Huck's prices and terms and conditions of sale. United States v. International Harvester Co., 274 U.S. 693, pp. 708–709, 47 S.Ct. 748, p. 754, 71 L.Ed. 1302, Sylb. 4 and Opinion p. 1310, where it is held:

"[T]he fact that competitors [in business] may see proper, in the exercise of their own judgment, to follow prices of another manufacturer, does not establish any suppression of competition or show any sinister domination."

Theater Enterprises v. Paramount Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273, Opinion p. 279 and Sylb. 2, where it is stated:

"Although parallel business behavior is admissible evidence from which the finder may infer an agreement in restraint of trade violative of the Sherman Antitrust Act Sec. 1, such parallel behavior does not it-self constitute a Sherman Act offense."

■ IV. The refusal by Huck Manufacturing Company to grant licenses to manufacture and sell lockbolts under its lockbolt patents to Brown-Line Corporation, Olympic Screw & Rivet Corporation, Illinois Tool Works, Pheoll Manufacturing Corporation, and Republic Steel Corporation, in the exercise of its own judgment and right to select or reject prospective licensees and to prefer one over others for considerations within its discretion, is legal and not violative of the Sherman Act as held in the decision in United States v. E. I. Du pont DeNemours & Co. referred to above.

■ V. The so-called cross- or grant-back licenses from Townsend to Huck respecting improvements of Townsend are nonexclusive and provide no power for restraint or monopolization of trade in such improvement, and on the contrary being adverse to restraint and monopoly, are not a violation of the Sherman Act.

■ It is established law, in Transparent-Wrap Machine Corporation v. Stokes and Smith Company, 329 U.S. 637, 645–648, 67 S.Ct. 610, 615–617; 91 L.Ed. 563, 570–572, that a covenant by a licensee under a patent license agreement to assign to the licensor patents for improvements is not per se illegal.

Furthermore, it is noted that in the cited case as distinguished from the case at bar, the improvements of the licensee were to be assigned outright to the licensor, which would give the licensor exclusive rights therein, while in the case at bar the grant-back provisions by the licensee give the licensor only a nonexclusive permission to use the licensee's improvements in common with the licensee and with others all of whom the licensee is free to choose and license.

See also Binks Manufacturing Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 259 (C.A.7), where it is held that a license-back clause requiring fu-

ture inventions by the licensee pertaining to method covered by the license to be licensed to the patentee royalty-free, on a nonexclusive basis, with right to sub-license others, is not per se illegal where there is no widespread network of such agreements between competing companies affecting an entire industry.

VI. The Court in a non-jury case, on motion under Rule 41(b), is not required to review the evidence in the light most favorable to the Government; it is required only to determine whether the plaintiff has made out its case by a preponderance of evidence. Island Service Co. v. Perez, 309 F.2d 799 (9th Cir. 1962); Allred v. Sasser, 170 F.2d 233 (7th Cir. 1948); United States v. Borden Co., 111 F.Supp. 562 (N.D.Ill. 1953); aff'd in part, rev'd in part, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954); Bach v. Friden Calculating Machine Co., Inc., 148 F.2d 407 (6th Cir 1945); Moore's Federal Practice, 1044–45 (2d Ed., 1951). Barron and Holtzoff, Federal Practice and Procedure, (2) Ed. 1961, (Vol. 2b) pp. 149–151.

Where the evidence submitted gives equal support to each of two inconsistent inferences, neither is established, and judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of the inferences as against the other. Penna. R. Co. v. Chamberlain, 228 U.S. 333, 339–340, 53 S.Ct. 391, 393, 79 L.Ed. 819, 823.

VII. I conclude upon the evidence submitted that the case at bar is in all material respects the same as and ruled by the decision in United States v. General Electric Co., 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362, and that it is distinguished in substantially the same respects as the General Electric case from the decisions in United States v. Masonite Corp., et al., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Univis Lens Company, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Line Material Company, et al., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701;

United States v. United States Gypsum Co., et al., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; United States v. New Wrinkle, Inc., et al., 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417; Newburgh Moire Co. v. Superior Moire Co., 3 Cir., 237 F.2d 283–284; United States v. Besser Mfg. Co., D.C., 96 F.Supp. 304, 310–311; United States v. Krasnov, et al., D.C., 143 F.Supp. 184; United States v. General Electric Co., D.C., 80 F.Supp. 989—which the Government urges as controlling.

In the case at bar the Court finds no industry-wide price-fixing licensing, no agreement or conspiracy between a plurality of licensees preventing grant of other licenses by the patent owner, no granting of a plurality of price-fixing licenses to a plurality of competing licensees, no cross licensing by one patent owner creating by contract in another the power to issue licenses and fix prices under patents which are not owned by the licensor, no pooling of independently owned competing patents with price-fixing licenses under the pooled competing patents, no arrangements for control of resale prices of patented devices, and no agreements for fixing prices on unpatented articles—some or all of which practices were found to be controlling aspects of the situations in the cases above mentioned on which the Government relies.

VIII. The Court concludes upon the evidence submitted by the plaintiff, and the law applicable thereto, that the plaintiff has not shown by preponderance of evidence that the defendants have or are engaged in a combination and conspiracy in unreasonable restraint of trade and to monopolize interstate trade and commerce in lockbolts in violation of Sections 1 and 2 of the Sherman Act, and has not shown any right to relief as prayed.

IX. The Court concludes that the plaintiff has failed to prove a violation of Sections 1 and 2 of the Sherman Act for the additional reason that it failed to show that the patent arrangements between Huck and Townsend were de-

signed to or did secure a reward beyond that to which Huck as the patent owner was legally entitled.

It is therefore ordered that judgment be entered herein against the plaintiff dismissing this action and the Complaint filed herein.