UNIVERSAL ELECTRONICS, INC., Plaintiff,

v.

ZENITH ELECTRONICS CORPORATION, Defendant.

No. 92 C 799.

United States District Court, N.D. Illinois, E.D.

Feb. 23, 1994.

---

---

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Defendant, Zenith Electronics, Inc. ("Zenith"), is the assignee of U.S. Patent Number 4,425,647 ("the '647 patent") which claims a system and a method of remote control of electrical devices such as television sets, video cassette recorders ("VCRs") and cable converter boxes. Plaintiff, Universal Electronics, Inc. ("Universal"), manufacturers

and sells remote control transmitter devices that control electrical devices sold by a number of manufacturers, including Zenith. Universal makes products that execute the signaling protocol defined in the claims of the '647 patent.

▮ Universal brought this action seeking a declaratory judgment that the '647 patent is invalid, unenforceable, and not infringed. Zenith responded by filing a counterclaim asking this Court to find that the '647 patent is valid,[1] enforceable and infringed by Universal. Before the Court is Universal's Motion for Partial Summary Judgment on the Issue of Non-Infringement. For the following reasons, the Motion is granted.

### I. ALLEGATIONS OF FACT

Universal manufactures and sells remote control devices that are used with a variety of electrical products. These remote control units require the user to input a code specific to the product or products the user wishes to control. This allows a consumer to control multiple devices, possibly supplied by different manufacturers. The system and method claimed in Zenith's '647 patent comprises a transmitter, a remote control unit, that forms a single word multibit code and transmits that code as single bits to a receiver, for example, a television, that acts in accordance with the coded function, for example changing channels. The claims of the '647 Patent require both a transmitter and a receiver, and do not extend to the transmitter by itself.

Universal's alleged infringing products are multibrand remote controls that constitute single devices designed to operate different coded electrical devices, some of which are manufactured by Zenith. Absent the defenses discussed below, there is no question, at this point, that a consumer using a Universal remote control transmitter unit to control a Zenith television[2] infringes the '647 patent.

---

1. The Court interprets Zenith's counterclaim as asking the Court to find that the patent is not invalid. All patents are valid when issued and courts have no power to declare them valid. All a court can do is find that a challenger has or has not shown a patent to be invalid. *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464,

1472 (Fed.Cir.1993) (Mayer, J., concurring in judgment); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1569 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

2. For simplicity, when the Court refers to television remote control, such a statement encom-

Similarly, that consumer does not infringe the '647 patent by controlling televisions sold by other manufacturers.

## II. ANALYSIS

### A. Standard on Motion for Summary Judgment

Summary judgment is appropriate when a court finds: "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Pfaff v. Wells Electronics, Inc.*, 5 F.3d 514, 517 (Fed.Cir.1993); *Renovich v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir.1990). As the moving party, Universal bears the burden of showing that there is no genuine issue of material fact. *See Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 3 F.3d 404, 413 (Fed.Cir.1993). The Court resolves all doubts concerning whether issues of material fact exist in Zenith's favor and draws all reasonable inferences in favor of Zenith. *See id.* at 413. However, Zenith cannot rest its argument on mere denials. It must present evidence that would be sufficient for a reasonable jury to find in its favor. *See id.* Thus, when deciding this motion, the Court must consider the underlying evidentiary standard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In this case, Zenith bears the burden of establishing infringement by a preponderance of the evidence. *See Advance Transformer Co. v. Levinson*, 1986 WL 84365, 231 U.S.P.Q. 1, 18 (N.D.Ill. 1986), *rev'd in part on other grounds*, 837 F.2d 1081 (Fed.Cir.1988).

### B. Infringement

In order to prove that Universal has infringed the '647 patent, Zenith must demonstrate either that Universal has directly infringed the Patent, under 35 U.S.C. § 271(a) (1988), has actively induced infringement, under 35 U.S.C. § 271(b) (1988), or has contributorily infringed, under 35 U.S.C. § 271(c) (1988).[3] Because Universal does not sell a receiving apparatus and its remote control transmitters do not carry out any receiving apparatus function, Zenith makes no contention that Universal has directly infringed the Patent. Rather, Zenith contends that Universal is liable for either contributory or induced infringement.

Universal sells its transmitters to owners of electrical devices, including owners of Zenith receivers which were sold with remote control transmitters. Owners of Zenith receivers seek Universal transmitters in three circumstances: (1) when the owner's Zenith transmitter breaks; (2) when the owner's Zenith transmitter is lost; and, (3) when the owner seeks to reduce "clutter".[4]

■ Universal contends that none of its customers directly infringe the '647 patent either because Zenith granted those customers an implied license to practice the invention or because those customers are repairing the system they purchased from Zenith. Absent direct infringement, Universal cannot be liable for contributory or induced infringe-

---

passes remote control of other devices listed above.

**3.** These sections state:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of com-

merce suitable for substantial noninfringing use, shall be liable as a contributory infringer. 35 U.S.C. §§ 271(a)–(c) (1988).

**4.** "Reducing clutter" refers to consolidating several remote control units that operate a television, a VCR, a cable box and a compact disk player into one remote control unit. This function is especially useful to control multiple devices manufactured by different companies, and in some circumstances, to schedule automatic use of such devices, such as a VCR.

Of course, an owner need not seek to repair a broken transmitter, replace a lost transmitter, or reduce "clutter" with solely Universal's transmitter. For example, the owner may pay to have a broken Zenith transmitter repaired or may purchase a new transmitter from Zenith, Universal, or some other transmitter manufacturer.

ment. *See Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed.Cir.1993). Universal also argues that, even if Zenith could show direct infringement of the '647 patent, it is not liable for contributory infringement because its remote control devices are staple articles of commerce that have substantial non-infringing use. Zenith argues that it did not grant the purchasers of its electronic equipment implied licenses, that those customers are not repairing the system but replacing a major component of the system, and that Universal's remote control devices are not staple articles of commerce.

■ Zenith may hold Universal liable for contributory or induced infringement only if it demonstrates that Universal's customers, the end users, directly infringe the '647 patent. Under 35 U.S.C. § 271(a), a person is liable for direct infringement if that person "without authority makes, uses or sells any patented invention." Here, Zenith contends that Universal's customers, having Zenith receivers, directly infringe the '647 patent through the unauthorized "use" of Universal's transmitter. The unauthorized use of a patented item, even by a consumer, constitutes an infringement of the patent on that item. *See, e.g., Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 480, 484, 84 S.Ct. 1526, 1528, 1531, 12 L.Ed.2d 457 (1964) (indicating that the purchasers who use patented convertible tops to cars sold without "authority" directly infringe the patent under section 271(a)). At issue here, then, is whether Zenith's television set customers are "unauthorized" in their use of the '647 patent, when the patented remote control system in the Zenith television set is "used" through the Universal remote transmitter.

If Zenith demonstrates that certain of its customers are directly infringing the '647 patent through use of the Universal transmitter, it may then demonstrate Universal's liability by satisfying the requirements of either section 271(b) or 271(c). The Court now turns to consider the scope of a Zenith customer's "authorized" use under the '647 patent. A purchaser's use of the Universal transmitter with a Zenith receiver is "authorized" either if the purchaser has an "implied license" to do so, or if such use constitutes a "permissible repair."

### C. Implied License

■ Universal contends that Zenith has granted its customers an implied license to practice its patent by making an unrestricted sale of its non-patented remote control transmitter together with the remote control device in its television receiver. Therefore, Universal argues, Zenith's customers can practice the patented method using any remote control transmitter. If Zenith so granted its customers an implied license to practice the '647 invention, then those customers cannot infringe the '647 claims. *See Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986). Zenith, on the other hand, argues that its conduct in simply selling the television with its non-patented remote control transmitter, is insufficient to imply a license to practice its patented method with any other remote control transmitter.

■ The doctrine of non-infringement due to an implied license stems from the principle that "the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold." *United States v. Univis Lens Co.*, 316 U.S. 241, 249, 62 S.Ct. 1088, 1092, 86 L.Ed. 1408 (1942). Clearly, Zenith granted the purchasers of its television set remote control equipment a license to use the claimed remote system as sold. But, the issue here is whether Zenith granted its customers a license to practice the invention with replacement remote control transmitter units.[5] This is a question of law. *See Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d at 687.

---

5. Of course, Zenith's sales of the remote/television combination grant the purchasers a license " 'to preserve its fitness for use so far as it may be affected by wear or breakage.' " *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345–46, 81 S.Ct. 599, 604, 5 L.Ed.2d 592 (1961) (quoting *Leeds & Catlin Co. v. Victor Talking Mach. Co.*, 213 U.S. 325, 336, 29 S.Ct. 503, 506, 53 L.Ed. 816 (1909)). This issue will be discussed in detail below.

Universal, as the alleged infringer, has the burden of proving that Zenith granted its customers an implied license. *See Met–Coil,* 803 F.2d at 687. To make this showing, Universal must establish that Zenith's remote control device in its television set has no non-infringing use and that the particular facts of Zenith's sale of the electronic equipment " 'plainly indicate that the grant of a license should be inferred.' " *See id.* at 686; *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 925 (Fed.Cir.1984) (quoting *Hunt v. Armour & Co.,* 185 F.2d 722, 729 (7th Cir.1950)). Universal must show that Zenith's actions lead its customers to believe that they could use replacement remote control units. *See Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559 (Fed.Cir.1983). If Universal establishes a *prima facie* case, the burden of going forward is shifted to Zenith. *Met–Coil,* 803 F.2d at 687.

Zenith does not argue that either its remote control transmitters or the infrared receivers in its television sets have any non-infringing uses. Therefore, Universal has met the first part of the test. Universal argues that it meets the second part of the test because Zenith did not disclaim a license in its sales. (*See* Kuolas Decl. ¶ 5.) Zenith responds that its silence on the matter of replacement transmitters is insufficient for the Court to imply a license to practice its invention with a non-Zenith remote control transmitter.

In the opinion of the Court, this case is governed by the Federal Circuit's decision in *Met–Coil Systems Corporation v. Korners Unlimited, Inc.,* 803 F.2d 684 (Fed.Cir.1986). Met–Coil Systems Corp. was the assignee of a patent which claimed an apparatus and method for connecting sections of metal ducts normally used in heating and air conditioning systems. The patented system's essential parts were integral flanges formed by a machine made by Met-coil and special corner pieces that were snapped in place before the duct sections were bolted together. Met-coil sold both the roll forming machine and the special corners, which were sold separately. The alleged infringer, Korners Unlimited, Inc., sold only the special corner pieces. Met-coil sued, claiming that Korners

Unlimited induced infringement or contributorily infringed by selling the corners. Finding for the defendant, the United States District Court for the Western District of Pennsylvania held that, by selling its roll-forming machines, Met-coil granted its purchasers an implied license to practice the patented system. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.,* 628 F.Supp. 130 (W.D.Pa.1986). On appeal, the Federal Circuit affirmed. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684 (Fed.Cir.1986).

The only issue in *Met–Coil* was whether the plaintiff's sale of roll forming machines plainly indicated that the grant of a license should be inferred. The alleged infringer contended that Met-coil's failure to restrict the sale of its machine established a *prima facie* case for infringement. The Federal Circuit agreed. It held, in broad language:

> A patent owner's unrestricted sales of a machine useful only in performing the claimed process and producing the claimed product "plainly indicate that the grant of a license should be inferred."

*Met–Coil,* 803 F.2d at 687. Since the defendant established a *prima facie* case for an implied license, the burden of going forward shifted to Met–Coil. Met–Coil produced nothing, thereby requiring the finding that its customers enjoyed an implied license under the patent. Zenith contends that a factual difference in this case is sufficient to distinguish *Met–Coil,* thereby preventing Universal from establishing a *prima facie* case. Alternatively, Zenith might argue that the factual distinction satisfies its burden of going forward, at least for the purposes of a motion for summary judgment. The Court rejects both arguments.

Zenith argues that no license is "plainly implied" under *Met–Coil* because, unlike in *Met–Coil,* it sells a completed invention, a transmitter and receiver together. Zenith claims that this argument is supported by *Leeds & Catlin Co. v. Victor Talking Machine Co.,* 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816 (1909), *overruled, Mercoid Corp. v. Mid–Continent Inv. Co.,* 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944), *reh'g denied,* 321 U.S. 802, 64 S.Ct. 525, 88 L.Ed. 1089 (1944), by the Supreme Court's decision in

*United States v. Univis Lens Co.*, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942), and by *Met–Coil*.

In *Leeds & Catlin*, the Supreme Court held that the defendant, a maker of phonograph records, infringed the plaintiff's patent on a method of reproducing sound from phonograph records. Zenith contends that this is a similar case. However, the *Leeds & Catlin* case is questionable authority. First, the case was overruled in *Mercoid Corp. v. Mid–Continent Inv. Co.*, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944), which challenged the doctrine of contributory infringement. While Congress, by subsequently passing 35 U.S.C. § 271(c), specifically permitted contributory infringement actions, it is uncertain to what degree prior case authority is persuasive. Second, *Leeds & Catlin* addressed the issue of what was a permissible repair. It was not directed at the question of what was a permissible license. While the two inquiries are often related, they are not necessarily duplicative.

In *Univis* and in *Met–Coil*, the system at issue was sold without all of the parts necessary to use the patented combination. In *Univis*, the patent rights holder sold lens blanks for glasses to finishers. The finishers fully practiced the patent by grinding and finishing the blanks. Similarly, in *Met–Coil*, as indicated above, the patent was only fully practiced when additional components, the corner pieces, were purchased.

■ Given the facts of the *Univis* and *Met–Coil* cases, Zenith urges the Court to read *Met–Coil* to state the following rule: a manufacturer's silence when it sells an incomplete element of a patented combination is sufficient to demonstrate a *prima facie* case for an implied license to use the patent with an otherwise unauthorized part. In contrast, Universal urges a different rule, based on the above quoted broad language. Universal's rule is this: A manufacturer's silence when it sells one or more elements of patented combination is sufficient to demonstrate a *prima facie* case for an implied license to use the patent with an otherwise unauthorized part. In the opinion of the Court, the *Met–Coil* case should not be read either as narrowly as Zenith urges or as broadly as Universal urges. Rather, the Court reads *Met–Coil*, and the other authority submitted by the parties, to require consideration of the facts and circumstances surrounding the sale of the patented item to determine whether there is an implied license or not. In some circumstances, particularly when a non-patented component is necessary to use a patented system or process, a manufacturer's silence is sufficient to establish a *prima facie* case. In other cases, silence, by itself, may not establish a *prima facie* case. The *Met–Coil* case does not require, as Zenith contends, that an implied license only be permitted where the patent holder has sold an incomplete means of using the patent. Nor does the case permit the conclusion, as Universal's position might be interpreted, that a manufacturer's silence *always* establishes a *prima facie* case for an implied license. However, in the opinion of the Court, Zenith's silence, in light of the circumstances of this case, is sufficient grounds for finding a *prima facie* case for an implied license.

Zenith indicates that it first sold transmitters and receivers employing the '647 patent before multiple brand, multiple function transmitters like Universal's were available. When technology changed and such transmitters became available, Zenith did not inform its customers they were not authorized to repair, replace, or reduce clutter with a non-Zenith transmitter. Zenith continued to sell its receivers, without limitation, to the public when any reasonable member of the public would think it permissible to use the new technology, whether to repair, replace, or reduce clutter.

There is no evidence in this case that Zenith has ever contacted past or present customers or potential purchasers to warn them that their use of a non-Zenith transmitter to employ the '647 patented remote control process would constitute a direct patent infringement for which they could be liable.[6]

6. Albeit with potential rights of indemnity from the seller of any infringing transmitter. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484 n. 5, 84 S.Ct. 1526, 1531 n. 5, 12 L.Ed.2d 457 (1964).

Obviously, to do so would be too great a competitive disadvantage for Zenith, given that other transmitter/receiver manufacturers acquiesce in their customers' use of transmitters such as Universal's. At minimum, Zenith has presented no evidence to the Court indicating that it actually limits its customers and forbids their purchase and use of multibrand transmitters like Universal's. Zenith is thus currently in the position of claiming, to its competitive advantage, that use of its '647 patent is restricted for the purposes of this litigation while not actually restricted in its use in the marketplace. Put another way, Zenith continues to sell its transmitter/receivers to purchasers without informing them that there is a substantial disadvantage in their buying the Zenith product, the disadvantage in not being able to use the receiver with anything but a Zenith remote transmitter.

Here, as in *Met–Coil*, the patent's assignee has made an unrestricted sale of a machine useful only, as it admits, in performing the claimed process. Under *Met–Coil*, this unrestricted sale, given changes in technology and the marketplace, establishes a *prima facie* case for an implied license. The burden of going forward thus shifts to Zenith. Zenith has produced insufficient evidence to carry its burden.

Given the circumstances in this case, then, the Court concludes that a license is "plainly implied" by Zenith's unrestricted sales of its remote control television sets. With the remote transmitter products available in the marketplace today, being sold in large volume in discount and other retail stores, no reasonable purchaser of a Zenith transmitter/receiver would think that he or she was barred from purchasing a multibrand, multicombination remote control transmitter and using it with the Zenith receiver. Zenith has already received its patent royalties from its customers. It cannot attempt, in litigation only against the manufacturer of one such non-patented transmitter, to leverage its combination patent over a transmitter/receiver system into the equivalent of a separate patent over the transmitter alone, when it

has not made public its position and so subjected itself to the risks of the marketplace.

Accordingly, Plaintiff's Motion for Partial Summary Judgment is granted. This decision, although limited to Count I of the Plaintiff's complaint, essentially disposes of the remainder of the Complaint and of Zenith's Counterclaim. Assuming, then, that this decision will be immediately appealed, for purposes of completing the record for appeal, the Court proceeds to rule on the remainder of the issues raised in this motion.

### D. *Permissible Repair or Impermissible Replacement*

■ Universal argues that Zenith's customers do not directly infringe the '647 patent when using the Universal transmitter because replacement of Zenith's transmitter with Universal's transmitter is permissible repair of the entire remote control system. Zenith contends that such action by its customers is impermissible reconstruction and thus constitutes direct infringement of the '647 claims.[7] If the permissible repair doctrine is applicable here, then Zenith's customers cannot directly infringe the patent and, consequently, Universal cannot be liable for contributory or induced infringement. *See Aro*, 365 U.S. at 341, 81 S.Ct. at 602; *Everpure, Inc. v. Cuno, Inc.*, 875 F.2d 300, 302 (Fed.Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989). Under this doctrine, a customer may replace or repair worn or broken unpatented parts of a patented combination. *Aro*, 365 U.S. at 345, 81 S.Ct. at 603; *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 272 (Fed.Cir. 1988). Impermissible reconstruction is limited to situations where "the entity, viewed as a whole, has become spent." *Aro*, 365 U.S. at 346, 81 S.Ct. at 604; *see Wilbur–Ellis Co. v. Kuther*, 377 U.S. 422, 425, 84 S.Ct. 1561, 1563, 12 L.Ed.2d 419 (1964) (stating: "Petitioners in adapting the old machines to a related use were doing more than repair in the customary sense; but what they did was kin to repair for it bore on the useful capacity of the old combination, on which the royalty had been paid.")

---

7. As noted above, Zenith has not notified its customers of this contention.

Zenith has introduced evidence that approximately 68% of Universal's customers purchase its remotes because they lost or broke their remote control units, while 25% purchase Universal remotes "to reduce clutter." (*See* Reisner Decl., Ex. 5.) While Zenith admits that repairing worn out keypads or replacing cracked casings constitute permissible repairs, Zenith contends that replacing an entire, albeit broken, remote control unit is impermissible reconstruction.

To decide this issue, the Court considers the three basic situations in which Zenith receiver owners purchase Universal transmitters. First, when Zenith's customers purchase Universal's remote control transmitters to replace a broken Zenith unit. Second, when those customers replace a fully functional Zenith remote with a Universal remote to reduce "clutter". Third, when those customers lose a Zenith remote control unit and replace it with a Universal apparatus.

### 1. Replacement of Broken Remote Control Units

 A consumer may replace any broken element of the transmitter/receiver combination if the patentee has not separately claimed that element. *See Porter v. Farmers Supply Service, Inc.*, 790 F.2d 882, 886 (Fed. Cir.1986). This is true even if the remote control transmitter is an "essential" or a "distinguishing" part of the claimed invention. *See Dawson Chem. Co. v. Rohm & Haas, Co.*, 448 U.S. 176, 217, 100 S.Ct. 2601, 2623, 65 L.Ed.2d 696 (1980); *Lummus*, 862 F.2d at 271. In this case, there is no question that Zenith has not claimed the remote control transmitter separately. Therefore, the only question before this Court is whether replacement of a broken transmitter amounts to "a second creation" of the patented combination or method. *See Aro*, 365 U.S. at 345–46, 81 S.Ct. at 604.

The parties have introduced evidence concerning the useful life of the transmitter to support their positions. Universal has introduced affidavits that the useful life of the remote control units is short and much shorter than the useful life of the television receiver.[8] (*See* Kuolas Decl. ¶¶ 6–7; Nelson Decl. ¶¶ 6–7.) Zenith, on the other hand, has submitted affidavits stating that its remote control units have a relatively long life, up to 10 years. (*See* Yello Decl. ¶¶ 4, 6; Kohler Decl. ¶ 4.)

Although the Court may not weigh evidence on a motion for summary judgment, there is no contradiction between the affidavits. Universal's evidence is based on its experience that Zenith's remote control transmitters break before the entire combination outlives its useful life. Zenith's affidavits, however, state Zenith's design or expected life, but do not address actual performance. Thus, Zenith's affidavits do not raise a genuine issue of material fact. Based on these affidavits, the Court finds that a substantial number of Zenith's remote control units break before the entire patented system. This leads to the conclusion that replacement of these broken remote control units does not involve creating a second system.

The flaw in Zenith's argument, that replacing the remotes is "a second creation of the patented entity," is that the "patented entity" is not the remote control transmitter, but the transmitter/receiver system. Furthermore, there is no credible evidence before the Court that, following breakage of the remote control transmitter, the entire combination, viewed as a whole, is spent. Consequently, the Court concludes that replacement of broken Zenith remote control transmitters simply is replacement of an unpatented broken part and thus permissible repair. Therefore, whether or not there exists an implied license, the Court grants Universal's Motion for Partial Summary Judgment with respect to the issue of infringement through repair.

---

8. Universal also has submitted an affidavit stating that when the cost of repair exceeds $5.00, certain customers replace the remotes rather than repairing them. The affiant states that replacement is chosen when the units are "too costly to repair." (*See* Kuolas Decl. ¶¶ 9, 11.) A Universal employee further testified that Universal repairs remote control units with cracked cases. (*See* Borges Dep. at 18.)

### 2. Replacement of Fully Functional Remote Control Transmitters to Reduce Clutter

■ Citing *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548, 21 L.Ed. 322 (1873) and *Thomas–Houston Electric Co. v. Kelsey Electric Railway Specialty Co.*, 75 F. 1005, 1010 (2d Cir.1896), Universal contends that permissible repair includes improving on unpatented component parts. As a consequence, Universal argues that those customers that replace Zenith remote control transmitters with Universal remotes to reduce clutter, do not directly infringe the claims of the '647 patent. Zenith responds that the doctrine of permissible repair means just that, repair of broken or worn parts, not replacement for improvement of working parts.

The *Thomas–Houston* court stated that a person purchasing a patented apparatus may "substitute a [part] which is better made,[9] and better adapted to his peculiar needs...." *Thomas–Houston*, 75 F. at 1010. However, the Court must view this statement in the context of the facts of that case. The purchaser found that it was necessary to change the unbroken part because it could not operate its railroad cars with the part supplied by the patent owner. *Id.* In the opinion of the Court, the holding of the *Thomas–Houston* court is more appropriately described as allowing the replacement as a consequence of an implied license to use the purchased apparatus.

Even if one could construe the reasoning of the *Thomas–Houston* court to come under the repair doctrine, more recent decisions of the Supreme Court and the Court of Appeals for the Federal Circuit do not support such a far-reaching extension of the repair doctrine.

See, e.g., *Aro*, 365 U.S. at 342, 81 S.Ct. at 602; *Lummus*, 862 F.2d at 270, 272. As the Federal Circuit has stated, a customer "may properly replace parts *only* 'to preserve its [a product's] fitness for use'" on account of wear or usage. *King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560, 1564 (Fed.Cir. 1987) (emphasis added). For example, spare parts that are "mere extra parts" are outside the right of repair. *Id.* at 1564.

On those few occasions where a court allowed replacement of a non-worn or broken part, special circumstances existed. For example, the *Everpure* court found no infringement when purchasers replaced non-worn filter cartridges because the patent owner designed the system in such a way that it was impossible to replace the expendable filter without replacing the cartridge. *Everpure*, 875 F.2d at 303.[10] But, there is no such special circumstance in this case. Universal has not introduced any evidence that customers must replace the Zenith remote control transmitter units. Consequently, the Court holds that, if there were no implied license, the doctrine of permissible repair would not allow Zenith's customers to replace non-broken remote control units.[11]

### 3. Replacement of Lost Remote Control Units

■ As explained above, the law of repair is confined to repairing worn or broken parts. In the opinion of the Court, the issue of lost transmitters is more appropriately analyzed under an implied license theory. Accordingly, the Court holds that a Zenith customer has an implied license to replace a lost Zenith transmitter remote with another manufacturer's remote.

---

9. The Supreme Court's statement in *Mitchell* that a purchaser may use a patented apparatus "until it is worn out, or he may repair it or improve upon it as he pleases" is *dicta*. Furthermore, it is not at all clear that the Court was referring to improvements that infringe the patent.

10. Even this decision was not unanimous. In her dissent, Judge Newman specifically stated that the doctrine of repair does not encompass replacement of parts that are not broken or worn out. *Everpure*, 875 F.2d at 305 (Newman, J., dissenting).

11. *Surgical Laser Technologies, Inc. v. Surgical Laser Prods., Inc.*, 1992 WL 245892, 25 U.S.P.Q.2d 1806 (E.D.Pa.1992), cited by Universal, is not applicable to this case. The defendant in *Surgical Laser* sold a part to replace a part that the patent owner designed to be disposable. The patent owner instructed its customers to discard that component after one use. Universal has introduced no evidence that Zenith's remote control transmitter device is disposable.

## E. Contributory Infringement

 Universal argues that to be liable for contributory infringement, whether or not end user's would directly infringe, its remote control units must not be "a staple article or commodity of commerce suitable for substantial noninfringing use...." *See* 35 U.S.C. § 271(c) (1988). Zenith disagrees.

Universal's argument is straight-forward. Its remote control units may be used by its customers to operate various electronic devices produced by a number of manufacturers other than Zenith. (*See* Tyler Decl. ¶ 5, Ex. 3.) Zenith does not dispute this contention, but argues that this fact does not make Universal's remotes staple articles of commerce. According to Zenith, the fact that Universal has added non-infringing functions to its remotes, in addition to infringing functions, does not make those remotes capable of substantial non-infringing use. *See Oak Indus., Inc. v. Zenith Elecs. Corp.,* 726 F.Supp. 1525 (N.D.Ill.1989).

 To determine if Universal's remotes are staple articles, the Court must look at the entire device, not just the part capable of practicing the '647 claims. *See Hodosh v. Block Drug Co.,* 833 F.2d 1575, 1578 (Fed. Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988). There is no doubt that the Universal remote control transmitter units, as a whole, are capable of controlling a large number of non-Zenith electronic appliances without practicing the '647 patent. But the question remains whether, by adding the capability to practice the patented method, Universal has made its remotes incapable of substantial non-infringing use.

Zenith refers the Court to *Oak* where the court considered whether cable converters that used the same circuitry to perform several functions, including one function that infringed a patented method, could be staple articles. Although *Oak* and this case are similar in that the accused contributory infringer sells an unpatented device capable of infringing, there is a major difference between the two cases. In *Oak,* the defendant, Zenith, argued that it was not liable for contributory infringement because the converters could perform several unpatented

functions and any infringement of the claimed process was inevitable due to the technology involved. *See Oak,* 726 F.Supp. at 1538. Based on the evidence, the *Oak* court concluded that there remained a question of fact about whether Zenith's converters had a substantial non-infringing use because the converters contained radiation shielding that may not have been necessary for the converters to practice the non-infringing functions. In this case, however, the parties agree that there is no infringement of Zenith's claims by users of Universal's remotes when controlling televisions manufactured by others. Thus, infringement of the '647 claims is not inevitable. Because of these factual differences, the Court concludes that the *Oak* test is inappropriate to the circumstances of this case.

Furthermore, after *Oak* was decided, the Federal Circuit made clear that the relevant inquiry is whether there are substantial non-infringing uses for a device, not whether a device is designed so as to allow infringement of a patented process. *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 674 (Fed.Cir.1990). In *C.R. Bard,* the patent at issue claimed a method for using a catheter to perform cardiac angioplasty. The alleged infringer supplied a device that contained extra openings for blood to flow. Analyzing the alleged infringing device, the district court stated:

> '[t]hat [the alleged infringer] has added extra holes further from the balloon does not affect the conclusion of infringement, as the patent does not require that *all* holes be 'immediately adjacent' the balloon, nor that the blood flowing through the balloon come *solely* from the coronary artery.'

*Id.* at 674 (quoting *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* No. SA CV 88–646–JSL, slip op. at 13 (C.D.Cal. July 28, 1989)).

The Federal Circuit assumed, without deciding, that the district court correctly decided that the patent claim covered the use of the alleged infringing apparatus. However, the court stated that the apparatus may have had other, non-infringing uses and conse-

quently, the district court should not have granted summary judgment in favor of the patent owner. *Id.* It seems clear from *C.R. Bard* that the Court must decide if Universal's remote control units have any non-infringing uses. If they do, those transmitters are staple articles and Universal cannot be liable for contributory infringement by selling them.

Viewing the facts of this case in a light most favorable to the non-movant, Zenith, the Court finds that there is no genuine issue of material fact that the Universal transmitter remotes have substantial non-infringing uses in that those remotes can operate many electronic devices not manufactured by Zenith. The Universal transmitter is thus a staple article suitable for substantial noninfringing uses. Therefore, whether there exists an implied license or not, the Court grants partial summary judgment to Universal on the issue of contributory infringement.[12]

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is granted, based on Plaintiff's implied license theory. However, regardless of the Court's holding with respect to the implied license theory, Plaintiff's Motion is granted with respect to a customer's repair and with respect to the contributory infringement theory.

Given that Plaintiff has stated that a ruling in its favor on this motion would "effectively dispose of both the Complaint and the Counterclaim", the Court anticipates a Rule 54(b) motion to facilitate the appeal of this case.

---

12. The Court wishes to make clear that, were the issue of an implied license still open, the Court's ruling on contributory infringement would not necessarily dictate the result on an actively inducing infringement theory. Although the Court rejected Zenith's argument that by designing the remotes to allow practice of the '647 patent Universal is liable for contributory infringement, such action possibly could support a claim of active inducement. *See Water Technologies Corp.*

*v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). Providing purchasers of its remotes instructions on how to use the '647 process might also constitute an inducement to infringe, once again assuming there is no license to do so. *See id.* at 668.

Finally, issues of patent invalidity and unenforceability would remain.